THOMPSON & CO.
Donald A. Thompson (SBN 260076)
One Embarcadero Center, Suite 500
San Francisco, CA 94111
Telephone: (415) 506-8105
Email: don@tco.law

*Counsel for Defendant*
*And Counterclaimant,*
*Lantah LLC.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| TELEGRAM MESSENGER INC, | Case No. 3:18-CV-2811-CRB |
| Plaintiff, | |
| | **DEFENDANT AND COUNTERCLAIMANT LANTAH LLC'S:** |
| vs. | |
| | **OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION;** |
| LANTAH, LLC, | |
| Defendant. | **COUNTER-MOTION FOR PARTIAL SUMMARY JUDGMENT; AND** |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | Dates:     August 3, 2018 (MPI) |
| | August 24, 2018 (MSJ) |
| | Time:      10:00 am (Both) |
| | Courtroom:  6, 17th Floor |
| | Judge:     Hon. Charles R. Breyer |
| AND RELATED COUNTERCLAIMS | |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on August 24, 2018 at 10:00 am, or as soon thereafter as the parties may be heard, Defendant and Counterclaimant Lantah LLC ("Lantah") will and hereby does move this Court for summary denial of the entire complaint filed by Plaintiff and Counterclaim Defendant Telegram Messenger Inc ("Telegram"), pursuant to Civil Local Rules 7-2 and 56, as well as Federal Rule of Civil Procedure 56.

This motion is based upon this Notice, the attached Memorandum of Points and Authorities, the concurrently filed Declaration of Daniel H. Jeffery ("Jeffery Decl."), the concurrently filed Declaration of Donald A. Thompson ("Thompson Decl."), all pleadings and documents that concern this case in the Court's file (specifically including all documents that concern the concurrently pending Motion for Preliminary Injunction), any other matter of which this Court may take judicial notice, and such further evidence and argument as may be introduced at the hearing on this Motion.

Respectfully submitted,

THOMPSON & CO.

Dated: July 12, 2018

/Donald A. Thompson/
Donald A. Thompson
Counsel for Defendant and Counterclaimant,
LANTAH LLC.

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................... 1

LEGAL STANDARD ................................................................................................. 4

BACKGROUND ........................................................................................................ 5

ARGUMENT ............................................................................................................. 7

    I.      SUMMARY JUDGMENT FOR LANTAH IS PROPER. A PRELIMINARY INJUNCTION AGAINST LANTAH IS NOT. ............................... 7

          A.     Telegram Owns No Rights, Having Rendered No Services and Used No Mark ........................................................................ 7

          B.     Telegram Suffers No Harm, Having Earned No Goodwill ................. 11

          C.     Telegram Risks No Hardship. It Can Choose Another Mark ................ 12

          D.     The Public Interest Disfavors an Injunction Against Lantah ................ 12

    II.     INTERNATIONAL COMITY PRECLUDES AN EXTRATERRITORIAL INJUNCTION AGAINST LANTAH ........................................ 12

CONCLUSION .......................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ........................................................................... 4

*American Express Co. v. Goetz*,
    515 F.3d 156 (2d Cir. 2008) .......................................................................... 2, 8

*Aycock Engineering, Inc. v. Airflite, Inc.*,
    560 F.3d 1350 (Fed. Cir. 2009) ..................................................................... 2, 8

*Blue Bell Inc. v. Farah Mfg. Co., Inc.*,
    508 F.2d 1260 (5th Cir. 1975) .......................................................................... 10

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
    174 F.3d 1036 (9th Cir. 1999) ........................................................... 2, 5, 8, 11

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................................. 3, 4, 5

*Champion-Cain v. MacDonald*,
    2015 WL 4393303 (S.D. Cal. July 15, 2015) ................................................ 12

*Chance v. Pac-Tel Teletrac Inc.*,
    242 F.3d 1151 (9th Cir. 2001) ....................................................... 2, 7, 8, 9, 10, 11

*Couture v. Playdom, Inc.*,
    778 F.3d 1379 (Fed. Cir. 2015) ..................................................................... 2, 8

*Dep't of Parks & Recreation for State of California v. Bazaar Del Mundo Inc.*,
    448 F.3d 1118 (9th Cir. 2006) .......................................................................... 11

*Gallup, Inc. v. Bus. Research Bureau (Pvt.) Ltd.*,
    688 F. Supp. 2d 915 (N.D. Cal. 2010) .................................................. 4, 14, 15

*George Washington Mint, Inc. v. Washington Mint, Inc.*,
    349 F. Supp. 255 (S.D.N.Y. 1972) .................................................................... 9

*Grooms v. Legge*,
    2009 WL 962067 (S.D. Cal. 2009) .................................................................... 9

*Grupo Gigante SA De CV v. Dallo & Co.*,
    391 F.3d 1088 (9th Cir. 2004) ......................................................... 3, 5, 9, 13, 14

*Halicki Films, LLC v. Sanderson Sales & Mktg.*,
    547 F.3d 1213 (9th Cir. 2008) ............................................................................ 9

*Hanover-Star Milling Co. v. Metcalf*,
    240 U.S. 403 (1916) ................................................................................... 7, 12

*Herb Reed Enters., LLC v. Florida Entm't Management, Inc.*,
   736 F.3d 1239 (9th Cir. 2013) ................................................................. 11

*In Re Holiday Mobile Home Resorts, Inc.*,
   144 USPQ 510 (TTAB Feb. 12, 1965) ...................................................... 2, 8

*Kaia Foods, Inc. v. Bellafiore*,
   70 F. Supp. 3d 1178 (N.D. Cal. 2014) ...................................................... 15

*Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*,
   986 F. Supp. 253 (D. Del. 1997), *aff'd*, 186 F.3d 311 (3d Cir. 1999) ...................................... 10, 11

*Microsoft Corp. v. AT & T*,
   550 U.S. 437 (2007) ................................................................................. 3, 16

*Mujica v. AirScan Inc.*,
   771 F.3d 580 (9th Cir. 2014) ................................................................... 1, 15

*Nexsan Techs., Inc. v. EMC Corp.*,
   260 F. Supp. 3d 68 (D. Mass. 2017) ......................................................... 11

*Old Swiss House, Inc. v. Anheuser-Busch, Inc.*,
   569 F.2d 1130 (C.C.P.A. 1978) ................................................................. 11

*Pinkberry, Inc. v. JEC Int'l Corp.*,
   2011 WL 6101828 (C.D. Cal. Dec. 7, 2011) ..................................... 4, 14, 15

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
   261 F.3d 1188 (11th Cir. 2001) .................................................................. 9

*In re Port Auth. of N.Y.*,
   3 U.S.P.Q.2d 1453 (TTAB 1987) ............................................................. 2, 8

*Rolley v. Younghusband*,
   204 F.2d 209 (9th Cir. 1953) ................................................................... 2, 8

*Selfway, Inc. v. Travelers Petroleum, Inc.*,
   579 F.2d 75 (C.C.P.A. 1978) ............................................................... 2, 8, 10

*Skydive Arizona, Inc. v. Quattrocchi*,
   673 F.3d 1105 (9th Cir. 2012) .................................................................. 12

*Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*,
   769 F.2d 1393 (9th Cir. 1985) ....................................................... 4, 13, 14, 15

*T.A.B. Sys. v. Pac-Tel Teletrac*,
   77 F.3d 1372 (Fed. Cir. 1996) .................................................................. 10

*Timberlane Lumber Co. v. Bank of America, N.T. and S.A.*,
   549 F.2d 597 (9th Cir. 1976) .................................................................... 13

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
   2012 WL 2343670 (N.D. Cal. June 20, 2012).................................................. 4, 14, 15

*United Drug Co. v. Theodore Rectanus Co.*,
   248 U.S. 90 (1918)...........................................................................................7

*Waldmann Lighting Co. v. Halogen Lighting Sys., Inc.*,
   1993 WL 243388 (N.D. Ill. July 1, 1993) ......................................................12

*WarnerVision Entertainment Inc. v. Empire of Carolina Inc.*,
   101 F.3d 259 (2d Cir. 1996) ....................................................................3, 10, 11

*Westrex Corp. v. New Sensor Corp.*,
   83 USPQ2d 1215 (TTAB May 11, 2007) .......................................................11

*Winter v. Natural Res. Def. Council Inc.*,
   555 U.S. 7 (2008)............................................................................................3, 4

*Zazu Designs v. L'Oreal, S.A.*,
   979 F.2d 499 (7th Cir. 1992) ..........................................................................10

*Zobmondo Entm't, LLC v. Falls Media, LLC*,
   602 F3d 1108 (9th Cir. 2010) .................................................................3, 10, 11

**Statutes**

15 U.S.C. § 1051(b)......................................................................................3, 5, 8, 9, 12

15 U.S.C. § 1057(c) ........................................................................................3, 5, 8, 9

15 U.S.C. § 1057(c)(1) ......................................................................................5, 10, 11

15 U.S.C. §§ 1126(b)-(d), 1057(c)(3).............................................................................6

15 U.S.C. § 1127...........................................................................................2, 8, 10

15 U.S.C. §§ 1141a, 1141b ...........................................................................................6

The Court and the World: American Law and New Global Realities at 7 (Knopf 2015) .....................16

**Other Authorities**

FRCP 56(a).....................................................................................................................4

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 16:2, 16:17, 19:29, 26:38
   (2018 Ed.) ...........................................................3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14

Paris Convention for the Protection of Industrial Property, Mar. 20, 1883 Art. 4(A)-(D), 21 U.S.T. 1583
   § 4(A)-(D)Art. 4(A)-(D), 21 U ..................................................................................3

Paris Convention § 4(A)-(D)...............................................................................3, 6

Paris Convention § 4(A)(1), (C)(1)..................................................................................6

Paris Convention § 4(A)(3)...........................................................................................6

Paris Convention § 4(C)(1), (C)(3)................................................................................6

Paris Convention § 6(1)...............................................................................................14

Paris Convention § 6(3)...............................................................................................14

Restatement (Third) of Unfair Competition § 18, cmt. b (1995). ................................12

Senate Judiciary Committee Report on S. 1883, S. Rep. No. 100-515 p. 5-6, 29-30.................... 5, 9, 12

United States Patent and Trademark Office, Trademark Manual of Examination Procedure §§ 904,
    1301.03(a) (Oct. 2017).....................................................................................2, 8

TMEP § 1902................................................................................................................6

TMEP § 1003.08...........................................................................................................6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

Lantah LLC ("Lantah") opposes the motion for preliminary injunction filed by Telegram Messenger Inc ("Telegram") and requests summary denial of each claim asserted by Telegram.

## INTRODUCTION

Telegram heralds the golden rule: "Whoever has the gold, makes the rules." *Aladdin* 27:06-16 (Disney 1992).[1] Its wish is not our command. Lantah enjoys priority in this case. Lantah not only used "Gram" for cryptocurrency services before Telegram, but also applied to register "Gram" for cryptocurrency services before Telegram. By this action, Telegram is attempting an unlawful brand grab. Telegram owns no rights, having rendered no services and used no mark. Telegram risks no harm, having earned no goodwill. Its motion should be denied, together with its claims. Far from showing entitlement to preliminary relief, it has not even shown a genuine dispute over priority.

Another golden rule informs this case: comity. That is the "golden rule among nations," which "compels us to give the respect to the laws, policies and interests of others that we would have others give to our own." *Mujica v. AirScan Inc.*, 771 F.3d 580, 608 (9th Cir. 2014) (citation omitted). Whatever rights Telegram may claim in the United States, they do not extend abroad. On the contrary, Lantah enjoys priority in foreign sovereignties that encompass the vast majority of the global population. Telegram seeks to preempt their laws in their lands by requesting an extraterritorial injunction from this Court. Its request should be refused.

## SUMMARY OF ARGUMENT

Telegram's motion raises two questions. First, did Telegram secure common law priority through private fundraising for prospective services before Lantah secured constructive use priority by filing an application with the United States Patent and Trademark Office? Second, assuming so, should an extraterritorial injunction issue against Lantah, which enjoys widespread priority abroad? The answer to both questions is no – the first as a matter of law, the second as a

---

[1]  *Scene available at* https://www.youtube.com/watch?v=3AEkLXkDgWI (quote at 0:36-0:46)

matter of comity. Accordingly, summary judgment for Lantah is proper; a preliminary injunction against Lantah is not.[2]

Since Telegram concedes that it has merely raised private funds for prospective services, its assertion of priority "fails on its own terms." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999). Common law priority arises "by adopting and *using* [a] mark in connection with services *rendered.*" *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001) (emphasis added) (citing *Hanover-Star Milling Co. v. Metcalf*, 240 U.S. 403, 412 (1916)); *accord* 15 U.S.C. § 1127 (defining "use in commerce"). "A mark cannot serve [its] function if the public has never seen [it]." *Brookfield*, 174 F.3d at 1051. Accordingly, private fundraising does not confer priority. *See Selfway, Inc. v. Travelers Petroleum, Inc.*, 579 F.2d 75, 78-79 (C.C.P.A. 1978); *In Re Holiday Mobile Home Resorts, Inc.*, 144 USPQ 510, 510 (TTAB Feb. 12, 1965). Neither does accepting private pre-orders for prospective goods or services. *See Couture v. Playdom, Inc.*, 778 F.3d 1379, 1380-81 (Fed. Cir. 2015); *In re Port Auth. of N.Y.*, 3 U.S.P.Q.2d 1453, *2-3 (TTAB 1987); United States Patent and Trademark Office, Trademark Manual of Examination Procedure §§ 904, 1301.03(a) (Oct. 2017) (hereinafter "TMEP").[3] Neither does undertaking private development of prospective goods or services. *See Brookfield*, 174 F.3d at 1052 (citing *Walt Disney Prods. v. Kusan, Inc.*, 204 U.S.P.Q. 284, 288 (C.D. Cal. 1979)); *Rolley v. Younghusband*, 204 F.2d 209, 212 (9th Cir. 1953); *Aycock Engineering, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1358 (Fed. Cir. 2009); *American Express Co. v. Goetz*, 515 F.3d 156, 160-61 (2d Cir. 2008). Even if priority could arise by using a mark in connection with private fundraising for prospective services, Telegram has not evidenced any such use. *Compare* Perekopsky Decl. ¶¶ 9-10 (characterizing Telegram's use) *with* TMEP §§ 904, 1301.03(a) (requiring a specimen of use). Telegram also has not attempted to argue that it secured priority based on a "totality of the circumstances." *Chance*, 242 F.3d at 1159. Any such argument has been waived and would be futile, particularly since

---

[2]  Lantah does not rely on its own common law priority on its pending motion for summary judgment. Lantah otherwise reserves the right to invoke such priority as this case proceeds.
[3]  *Available at* https://tmep.uspto.gov/RDMS/TMEP/current#/current/TMEP-900d1e489.html

any use was not "sufficiently public to identify or distinguish [its services] in an appropriate segment of the public mind." Lantah reserved "Gram" for cryptocurrency services at the United States Patent and Trademark Office on February 25, 2018. *See* 15 U.S.C. §§ 1051(b), 1057(c). Telegram did not accrue priority earlier and cannot accrue priority since. *See Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F3d 1108, 1111 n.3 (9th Cir. 2010); *WarnerVision Entertainment Inc. v. Empire of Carolina Inc.*, 101 F.3d 259, 261-63 (2d Cir. 1996); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 16:2, 16:17, 19:29, 26:38 (2018 Ed.) (hereinafter "*McCarthy*"). Accordingly, Telegram has not made the clear showing to secure a preliminary injunction, *Winter v. Natural Res. Def. Council Inc.*, 555 U.S. 7, 22 (2008), or even raised a genuine dispute to avoid summary judgment, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Even if Telegram deserved relief, the extraterritorial injunction it seeks would be improper. "United States law governs domestically but does not rule the world." *Microsoft Corp. v. AT & T*, 550 U.S. 437, 454 (2007). Each mark has "a separate existence in each sovereign territory in which it is registered or legally recognized." *McCarthy* § 29:1; *accord Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1093 (9th Cir. 2004). Whatever rights Telegram may claim in the United States, they do not extend abroad. On the contrary, Lantah enjoys pervasive foreign priority, having filed an application to register "Gram" for cryptocurrency services on February 25, 2018 in the United States, where Lantah resides, followed by conforming applications in numerous other sovereignties that encompass a vast majority of the global population. Jeffery Decl. ¶ 4 Ex. D; Thompson Decl. ¶¶ 3-8, Exs. B, N-AD. Each such application warrants "priority as of the date of the first filing." *See McCarthy* §§ 29:17, 29:25; *Paris Convention for the Protection of Industrial Property*, Mar. 20, 1883, as revised at Stockholm, July 14, 1967 Art. 4(A)-(D), 21 U.S.T. 1583 § 4(A)-(D) (hereinafter, "Paris Convention").[4]   By contrast, Telegram first applied to register "Gram" or "Grams" with

---

[4]   The Paris Convention is "the principal international treaty governing . . . trademarks and unfair competition." *McCarthy* § 29:25. One-hundred and seventy-seven jurisdictions have adopted it, including the United States. *See* Thompson Decl. Ex. C.

cryptocurrency services on April 25, 2018 in the European Union, where Lantah has subsequently initiated opposition proceedings to enforce its senior rights. Thompson Decl. ¶¶ 10-11, Exs. G-J. Under these circumstances, the requested injunction would improperly "conflict with [foreign] . . . trademark law." *See Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir. 1985); *accord Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, 2012 WL 2343670, *7-9 (N.D. Cal. June 20, 2012); *Pinkberry, Inc. v. JEC Int'l Corp.*, 2011 WL 6101828, at *5-8 (C.D. Cal. Dec. 7, 2011); *Gallup, Inc. v. Bus. Research Bureau (Pvt.) Ltd.*, 688 F. Supp. 2d 915, 924 (N.D. Cal. 2010). It "would not only violate the principle of trademark territoriality" but also "the principle of comity among the law and courts of different nations." *McCarthy* § 29:7. It should be accordingly denied.

### LEGAL STANDARD

### Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can [also] support issuance of a preliminary injunction, so long as the plaintiff also shows that" the other two requirements are satisfied. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### Summary Judgment

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). In particular, summary judgment for a defendant is warranted when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of

proof concerning an essential element of the [plaintiff's] case necessarily renders all other facts immaterial." *Id.* at 322-23. In this case, Telegram bears the burden of proving that it secured common law priority to the disputed mark before Lantah secured constructive use priority by filing an application at the United States Patent and Trademark Office on February 25, 2018. *See* 15 U.S.C. §§ 1051(b), 1057(c)(1); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999); *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1100 (9th Cir. 2004) (state and federal claims "substantially congruent"); *McCarthy* §§ 16:2, 16:17. This issue is "dispositive." Dkt. # 16 at vii ln. 8.

## BACKGROUND

Daniel Jeffery is twenty-three years old. He formed a company last summer. He named it for the city of his birth: Atlanta (i.e., Lantah). He named its cryptocurrency for a unit in the metric system: Gram. He told the world about his plans. He built a business to pursue them. He filed an application to protect them. Then he got sued. Jeffery Decl. ¶¶ 1-4, Exs. A-D, F.

Now that application matters. It was filed at the United States Patent and Trademark Office on February 25, 2018. It reserved the mark "Gram" to Lantah for "[f]inancial services, namely, providing a virtual currency for use by members of an on-line community via a global computer network." Jeffery Decl. Ex. D. It invoked an "intent to use" procedure that Congress established by statute to avoid "significant legal risks on the introduction of new products and services" that "frequently disadvantaged small businesses and individuals." Senate Judiciary Committee Report on S. 1883, S. Rep. No. 100-515 p. 5 (hereinafter "*Senate Report*");[5]  *see* 15 U.S.C. § 1051(b). It also conferred a "constructive use" priority that Congress established by statute to "promote certainty in the acquisition of federal trademark rights," to "reduce the geographic fragmentation of trademark rights," and to "encourage the earlier filing of applications." *Senate Report* pp. 29-30; *see* 15 U.S.C. § 1057(c); *McCarthy* §§ 5:9, 16:2, 16:17, 26:38. The application will publish on July 24, 2018, having been favorably examined by the United States Patent and Trademark Office. Jeffery Decl. Ex. E.

---

[5]  *Available at McCarthy* App'x A5.

Lantah has subsequently filed numerous conforming applications warrant "convention priority" in foreign jurisdictions.[6]  Thompson Decl. ¶¶ 3-8 Exs. B, N-AD. "Convention priority" arises upon filing a first application in any country that adheres to the Paris Convention where the applicant is domiciled or has an establishment. *See* Paris Convention § 4(A)-(D); *see, e.g.*, 15 U.S.C. §§ 1126(b)-(d), 1057(c)(3) (effectuating convention priority in the United States); *McCarthy* §§ 29:17, 29:25. Any conforming application that claims "convention priority" in any other country that adheres to the Paris Convention within six months after the first application is "given priority as of the date of the first filing." *McCarthy* § 29:25; Paris Convention § 4(A)(1), (C)(1). In this way, "convention priority" gives applicants time "to decide in which countries they wish to seek protection, and to organize with due care the steps necessary for securing protection." *See* Thompson Decl. Ex. K. Moreover, "convention priority" remains effective "whatever may be the subsequent fate of the application" on which it is based. Paris Convention § 4(A)(3); *see, e.g.*, TMEP § 1003.08 ("If the applicant met the requirements of [convention priority] on the filing date of the U.S. application, the applicant will retain the priority filing date even if the foreign application is abandoned.") Since Lantah first applied to register "Gram" in the United States (the country where it resides, which adheres to the Paris Convention) on February 25, 2018, it may claim "convention priority" for any conforming application in any other country that adheres to the Paris Convention through August 27, 2018 (six months and one weekend later). *See* Jeffery Decl. ¶¶ 1, 4, Exs. D, F; Paris Convention § 4(C)(1), (C)(3). To date, Lantah has filed numerous such applications in jurisdictions that collectively encompass the vast majority of the global population: over 82%. Each such application is entitled to "convention priority" as of February 25, 2018. Thompson Decl. ¶¶ 3-8 Exs. B, N-AD.

Telegram has not filed any application to register "Gram" in the United States. Thompson Decl. ¶ 9. Telegram has instead filed this lawsuit – without prior notice to Lantah – in an apparent effort to capture senior rights. Jeffery Decl. ¶ 7. Telegram has also filed applications to

---

[6]  Lantah has filed various such applications in foreign jurisdictions directly. Lantah has also filed an application at the United States Patent and Trademark Office seeking extensions of protection to other jurisdictions pursuant to the Madrid Protocol. *See* 15 U.S.C. §§ 1141a, 1141b; TMEP § 1902; *McCarthy* §§ 19:31:20, 19:31.55.

register "Gram" and "Grams" for "financial services, namely, providing a general purpose virtual currency via a global computer network" in the European Union. Lantah has asserted its senior rights against these applications in the European Union, where opposition proceedings are currently pending. Thompson Decl. ¶¶ 10-11, Exs. G-J.

Telegram has not provided any cryptocurrency services under "Gram." *See* Dkt. # 1 ¶¶ 4, 29; Perekopsky Decl. ¶ 6. Seemingly, Telegram has not used that mark at all. For example, its public securities filings do not show that mark. *See* Hammon Decl. Exs. B, C. Its much-touted fundraising agreements have not been disclosed. Indeed, Telegram has furnished no specimen showing its use of the mark it purports to enforce. *See* Perekopsky Decl. ¶¶ 6, 9-10; Hammon Decl. ¶¶ 3-4; Dkt. # 16 at 2:1-20.

Telegram claims that its messenger service has two-hundred million monthly active users who will provide a "network" for its prospective cryptocurrency services. *See* Perekopsky Decl. ¶ 4; Dkt. # 1 ¶¶ 24, 26. According to a public source, roughly one-percent of these users can be found in the United States. Thompson Decl. Ex. L.

## ARGUMENT

### I.   SUMMARY JUDGMENT FOR LANTAH IS PROPER. A PRELIMINARY INJUNCTION AGAINST LANTAH IS NOT.

#### A.   Telegram Owns No Rights, Having Rendered No Services and Used No Mark.

"[A] trademark is the . . . symbol of the good will and reputation that a business has built up in a product or service." *McCarthy* § 3:2. "A trademark has no existence separate from the good will of the product or service it symbolizes." *McCarthy* § 2:15. "The redress accorded in trademark cases is based upon the party's right to be protected in [this] good will." *Hanover-Star Milling Co. v. Metcalf*, 240 U.S. 403, 412 (1916). "There is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which [it] is employed." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918).

Accordingly, common law priority arises "by adopting and *using* the mark in connection with services *rendered.*" *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156-57 (9th Cir. 2001) (emphasis added) (citing *Hanover-Star*, 240 U.S. at 412); *accord* 15 U.S.C. § 1127

(defining "use in commerce").[7]  In this case, Telegram owns no rights, having rendered no services and used no mark. Telegram is mistaken that common law priority arises from private fundraising for prospective services. *See* Dkt. # 16 at 6:6-7:10. In general, priority does not arise from mere "intent" or "preparation" to use a mark in connection with prospective goods or services, absent an application to register the mark. *Brookfield Commc'ns, Inc. v. W. Coast Ent't Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999); 15 U.S.C. §§ 1051(b), 1057(c); *see McCarthy* §§ 16:2, 16:11-12, 16:15-17. In particular, priority does not arise when a mark is merely used to raise funds from private investors. *See Selfway, Inc. v. Travelers Petroleum, Inc.*, 579 F.2d 75, 78-79 (C.C.P.A. 1978); *In Re Holiday Mobile Home Resorts, Inc.*, 144 USPQ 510, 510 (TTAB Feb. 12, 1965). Priority does not arise when a mark is merely used to accept pre-orders of prospective goods or services. *See Couture v. Playdom, Inc.*, 778 F.3d 1379, 1380-81 (Fed. Cir. 2015); *In re Port Auth. of N.Y.*, 3 USPQ2d 1453, 1455 (TTAB 1987); TMEP §§ 904, 1301.03(a). Priority does not arise when a mark is merely used to privately develop prospective goods or services. *See Brookfield Commc'ns*, 174 F.3d at 1052 (citing *Walt Disney Prods. v. Kusan, Inc.*, 1979 WL 25051, at *3 (C.D. Cal. Sept. 26, 1979); *Rolley v. Younghusband*, 204 F.2d 209, 212 (9th Cir. 1953); *Aycock Engineering, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1358 (Fed. Cir. 2009); *American Express Co. v. Goetz*, 515 F.3d 156, 161 (2d Cir. 2008). After all, "a mark cannot serve [its] function if the public has never seen [it]." *Brookfield*, 174 F.3d at 1051. Even if priority could arise by using a mark in connection with private fundraising for prospective services, Telegram has not evidenced any such use. *Compare* Perekopsky Decl. ¶¶ 9-10 (characterizing Telegram's activities) *with* TMEP §§ 904, 1301.03(a) (requiring a specimen of use). Accordingly, Telegram does not enjoy priority on the facts of this case. This is "dispositive." Dkt. # 16 at vii. ln. 8.

Telegram has not cited a single case where common law priority arose from private use of a mark for prospective goods or services. For example, *Planetary Motion, Inc. v.*

---

[7] In this case, both parties seek to register and purport to enforce service marks. *See* Jeffery Decl. Ex. D; Thompson Decl. Exs. G-H; Dkt. ## 1 ¶ 2 & 14 p. 6 ¶ 1. In any event "[s]ervice marks and trademarks are governed by identical standards." *Chance*, 242 F.3d at 1156 (internal citation omitted).

*Techsplosion, Inc.*, 261 F.3d 1188 (11th Cir. 2001) involved a dispute over ownership of a mark that had been publicly used on software for many years. *Id.* at 1191, 1196-97. *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213 (9th Cir. 2008) involved a dispute over ownership of two marks that had been publicly used on vehicles and toy replicas for many years. *Id.* at 1217, 1226-27. *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088 (9th Cir. 2004) involved a dispute over the territorial scope of a mark that had been publicly used on grocery stores for several decades. *Id.* at 1091-92. *Grooms v. Legge*, 2009 WL 962067 (S.D. Cal. 2009) involved an oral contract dispute, not a trademark priority dispute. *Id.* at 8-9 ("It is undisputed plaintiffs owned a valid, protectable trademark before September 2008."). Finally, *George Washington Mint, Inc. v. Washington Mint., Inc.*, 349 F. Supp. 255 (S.D.N.Y. 1972) involved a dispute over ownership of a mark that had been used on goods for several months, during which time the prevailing party had actively publicized the goods and displayed them in its storefront. *Id.* at 260. Notably, *Washington Mint* also predated the advent of "constructive use" priority and the "intent-to-use" procedure, which Congress implemented to prevent similar disputes from recurring in the future. *See Senate Report* pp. 5-6, 29-30; 15 U.S.C. §§ 1051(b), 1057(c). Nowadays, anyone can "establish an early priority by filing an [intent-to-use] application," and anyone "that neglects to do so will find it very difficult to prove that its priority arose from . . . activities made in preparation for actual sales under the mark." *McCarthy* § 16:16.

Telegram has not attempted to argue that it secured priority based on a "totality of the circumstances" prior to February 25, 2018. *Chance*, 242 F.3d at 1159. Any such argument has been waived and would be futile. Relevant factors include: (1) "whether the mark was sufficiently public to identify or distinguish the marked service in an appropriate segment of the public mind"; (2) "the genuineness and commercial character of [any non-sales] activity"; (3) "the scope of the non-sales activity relative to what would be a commercially reasonable attempt to market the service"; (4) "the degree of ongoing activity of the holder to conduct the business using the mark"; (5) "the amount of business transacted"; and (6) "other similar factors which might distinguish whether a service has actually been rendered in commerce" before an adverse party secured "constructive use" priority. *Chance*, 242 F.3d at 1159; 15 U.S.C. § 1057(c)(1); *see*

1    *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F3d 1108, 1111 n.3 (9th Cir. 2010);

2    *WarnerVision Entertainment Inc. v. Empire of Carolina Inc.*, 101 F.3d 259, 259-63 (2d Cir.

3    1996); *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 986 F. Supp. 253, 257-59 (D. Del.

4    1997), *aff'd*, 186 F.3d 311 (3d Cir. 1999); *McCarthy* §§ 16:2, 16:17, 19:29, 26:38. Bona fide

5    commercial intent is necessary but not sufficient to establish priority under this test. *See* 15

6    U.S.C. § 1127 (defining "use in commerce"); *Chance*, 242 F.3d at 1160.

7    　　　Telegram cannot make a colorable showing on these factors, which may explain why it

8    has not tried. Telegram had not used "Gram" in a "sufficiently public" manner prior to February

9    25, 2018 (or since) to identify and distinguish its cryptocurrency services in an "appropriate

10    segment of the public mind" – i.e., "a substantial portion of the public that might be expected to

11    [use its] service" considering the total "size of the market." *Chance*, 242 F.3d at 1159, *T.A.B.*

12    *Sys. v. Pac-Tel Teletrac*, 77 F.3d 1372, 1377 (Fed. Cir. 1996). Although Telegram brags that its

13    messenger service has two-hundred million monthly active users, there is no evidence that any

14    have seen it use the term "Gram" in connection with its prospective cryptocurrency services. *See*

15    Perekopsky Decl. ¶ 4, Exs. A-D. Indeed, there is no evidence that its own investors have seen it

16    use the term "Gram" in connection its prospective cryptocurrency services, and they are not the

17    "relevant class" of prospective users anyway. *See Blue Bell Inc. v. Farah Mfg. Co., Inc.*, 508

18    F.2d 1260, 1266 (5th Cir. 1975). There is legally insufficient evidence of buried references to

19    "Gram" in three reports published in December 2017, one of which expressly states that it

20    "could not be taken at face value."[8]  *See* Hammon Decl. Ex. A. These are the only reports that

21    matter. The other cited reports appeared after February 25, 2018 or do not include the term

22    "Gram," which may explain why copies have not been furnished. *See* Dkt. # 16 n.2. In sum,

23    Telegram made no impact on prospective customers using the disputed mark during the relevant

24    timeframe, or any such impact was immaterial, especially compared to Telegram's ambitions for

25

26    [8]  Lantah acknowledged the existence of these reports on information and belief after being
served with copies in this case. *See* Dkt. # 1 Ex. A; Dkt. # 14 pp. 6:5-6 & 8:13-14. Its supposed
27    admission of contemporaneous knowledge is both imagined and irrelevant. *See Zazu Designs v.*
*L'Oreal, S.A.*, 979 F.2d 499, 504 (7th Cir. 1992) (defendant's knowledge "irrelevant"); *Selfway,*
28    *Inc. v. Travelers Petroleum, Inc.*, 579 F.2d 75, 79 (C.C.P.A. 1978) (same).

"widespread use and adoption" (Dkt. # 1 ¶¶ 20, 25-26). *See Dep't of Parks & Recreation for State of California v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1127 (9th Cir. 2006) ("Introduction of . . . two brochures, without any evidence of sales activity and extent of distribution, [fell] far short of what is required.")*; Chance*, 242 F.3d at 1156-57 (priority denied as a matter of law after mark appeared on "35,000 post cards"); *Brookfield*, 174 F.3d at 1052 (priority denied after mark appeared on "limited e-mail correspondence with lawyers and a few customers"); *Old Swiss House, Inc. v. Anheuser-Busch, Inc.*, 569 F.2d 1130, 1133 (C.C.P.A. 1978) (priority denied after mark appeared in twelve articles and one speech); *Nexsan Techs., Inc. v. EMC Corp.*, 260 F. Supp. 3d 68, 77 (D. Mass. 2017) (priority denied after mark was seen by 0.84-10% of potential customers during 84 presentations); *Westrex Corp. v. New Sensor Corp.*, 83 USPQ2d 1215, *3-5 (TTAB May 11, 2007) (priority denied as a matter of law after mark appeared on website, announcement, press release, trade shows, and price lists).

The remaining factors compel the same result. Telegram has engaged in private fundraising rather than "commercial . . . activity." *Chance*, 242 F.3d at 1159. Telegram has engaged in secretive development rather than a "commercially reasonable attempt to market." *Id.* Telegram has maintained a holding pattern rather than "conduct[ ] business using the mark." *Id.* Telegram has filed suit rather than "transact" business. *Id.* In sum, Telegram had accrued no rights before February 25, 2018 and can accrue none since. *See* 15 U.S.C. § 1057(c)(1); *Zobmondo*, 602 F3d at 1111 n.3 (9th Cir. 2018); *WarnerVision*, 101 F.3d at 259-63; *Lucent*, 986 F. Supp. at 257-59; *McCarthy* §§ 16:2, 16:17, 19:29, 26:38.

Viewed in the light most favorable to Telegram, the evidence shows that Telegram has an idea for a trademark. "An idea for a trademark is not a trademark." *McCarthy* § 16:11.

### B.    Telegram Suffers No Harm, Having Earned No Goodwill.

"[A] plaintiff must establish irreparable harm . . . to [secure] a preliminary injunction in a trademark infringement case." *Herb Reed Enters., LLC v. Florida Entm't Management, Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). "The redress that is accorded in [such] cases is based upon the party's right to be protected in the good will of [its] trade or business." *Hanover-Star Milling Co. v. Metcalf*, 240 U.S. 403, 412 (1916). In this case, Telegram warrants no redress and suffers

no harm because it enjoys no goodwill in "Gram." *See supra* pp. 7-11. "A designation that has not been used as a trademark has no good will to symbolize." *McCarthy* § 18:2.

### C.      Telegram Risks No Hardship. It Can Choose Another Mark.

"It is believed that the vast majority of . . . junior users, upon learning of a conflicting prior [intent-to-use] application, will drop their activities under the disputed mark and quickly change to a different mark." *McCarthy* § 19:30. For whatever reason, Telegram is taking a different tack. It does so at its peril. Common law "affords no security for preparatory investments undertaken prior to actual use." Restatement (Third) of Unfair Competition § 18, cmt. b (1995). "[T]he expenditures required to introduce a new mark or name in the marketplace remain at risk of the designation's prior adoption by another." *Id.* Congress established the "intent-to-use" procedure to obviate such uncertainty. *See Senate Report* pp. 5-6; 15 U.S.C. § 1051(b). Having declined to invoke this procedure, Telegram cannot complain about the consequences. It can only choose another mark – and should. "Gram" is taken.

### D.      The Public Interest Disfavors an Injunction Against Lantah.

"Courts should not enjoin conduct that has not been found to violate any law." *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012); *accord Champion-Cain v. MacDonald*, 2015 WL 4393303, *13 (S.D. Cal. July 15, 2015). Thus, "the public interest . . . hinges on the merits of the case." *Waldmann Lighting Co. v. Halogen Lighting Sys., Inc.*, 1993 WL 243388, *1 (N.D. Ill. July 1, 1993). In this case, the public interest will be served by denying Telegram's motion, together with its claims.[9]

## II.      INTERNATIONAL COMITY PRECLUDES AN EXTRATERRITORIAL INJUNCTION AGAINST LANTAH.

No injunction should have extraterritorial effect unless "the interests of, and links to, the United States . . . are sufficiently strong, vis-a-vis those of other nations, to justify an assertion of extraterritorial authority." *Timberlane Lumber Co. v. Bank of America, N.T. and S.A.*, 549

---

[9]  Telegram has not alleged that Lantah made any false statement to the USPTO. Moreover, any such allegation would be meritless. *See McCarthy* § 31:75 ("Such charges of fraud and nondisclosure have uniformly been rejected . . .")

F.2d 597, 613 (9th Cir. 1976). Relevant considerations include: (1) "the degree of conflict with foreign law or policy"; (2) "the nationality or allegiance of the parties and the locations or principal places of business of corporations"; (3) "the extent to which enforcement by either state can be expected to achieve compliance"; (4) "the relative significance of effects on the United States as compared with those elsewhere"; (5) "the extent to which there is explicit purpose to harm or affect American commerce"; (6) "the foreseeability of such effect"; and (7) "the relative importance to the violations charged of conduct within the United States as compared with conduct abroad." *Id.* at 614. "[T]hese seven factors should be balanced in each case." *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1395 (9th Cir. 1985).

The risk of conflict between foreign and domestic law is significant in a trademark priority dispute. "[A] trademark is recognized as having a separate existence in each sovereign territory in which it is registered or legally recognized." *McCarthy* § 29:1. "What one must do to acquire trademark rights in one country will not always be the same as what one must do in another." *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1093 (9th Cir. 2004). "[T]rademark rights exist in each country solely according to [its] statutory scheme."[10] *Id.* (citation omitted). Thus, one mark may identify "two different sources in two different [countries]." *McCarthy* § 29:7 (collecting examples).

The avoidance of conflict between foreign and domestic law is expected by the Paris Convention. "The [Paris] Convention is not premised upon the idea that the trademark laws of each member nation shall be given extraterritorial application, but on exactly the converse principle that each nation's law shall have only territorial application." *McCarthy* § 29:25. According to its terms, "[t]he conditions for the filing and registration of trademarks shall be determined in each country . . . by its domestic legislation." Paris Convention § 6(1). "A mark duly registered in a country . . . shall be regarded as independent of marks registered in the other countries . . . including the country of origin." Paris Convention § 6(3). "[W]e are arguably

---

[10]  For example, "[m]ost civil law nations follow the rule that ownership and priority . . . go to the party who was first to file an application or obtain a registration." *McCarthy* § 16:1.50.

1    required by the Paris Convention, of which the United States is a signatory, to preserve the

2    territoriality principle in some form." *Grupo Gigante*, 391 F.3d at 1097.

3        Against this background, United States courts consistently deny an extraterritorial

4    injunction when foreign law contradicts domestic law and foreign interests outweigh domestic

5    interests in a trademark dispute. For example, in *Star-Kist Foods*, the United States Court of

6    Appeals for the Ninth Circuit denied an extraterritorial injunction because (1) it "could create a

7    conflict with Philippine . . . trademark law," (2) "[t]he effect on United States commerce . . .

8    [was] relatively insignificant compared to the effect on Philippine commerce," and (3) "[t]he

9    other [factors did] not mandate a contrary result." *Star-Kist*, 769 F.2d at 1396; *see also Ubiquiti*

10   *Networks, Inc. v. Kozumi USA Corp.*, 2012 WL 2343670, *7-9 (N.D. Cal. June 20, 2012)

11   (limiting extraterritorial injunction because "Argentina has the right to adjudicate how a

12   trademark issued in that country is used in that country."); *Pinkberry, Inc. v. JEC Int'l Corp.*,

13   2011 WL 6101828, *5-8 (C.D. Cal. Dec. 7, 2011) (denying extraterritorial injunction to avoid "a

14   serious potential for conflict with foreign law" despite "some effect on the United States");

15   *Gallup, Inc. v. Bus. Research Bureau (Pvt.) Ltd.*, 688 F. Supp. 2d 915, 923-24 (N.D. Cal. 2010)

16   (denying summary judgment due to "troubling issues of comity" despite "some effect on . . . the

17   United States"); *McCarthy* § 29:7 (If a United States court were to enjoin the use of a mark in a

18   foreign jurisdiction that is recognized under foreign law, "it would not only violate the principle

19   of trademark territoriality" but also "the principle of comity among the law and courts of

20   different nations.")

21       On the facts of this case, an extraterritorial injunction against Lantah would be

22   particularly unwarranted. Notably, an extraterritorial injunction against Lantah would cause a

23   direct conflict with the law of every other sovereignty where it has filed an application,

24   encompassing the vast majority of the global population: over 82%. *See* Thompson Decl. ¶¶ 3-8

25   Ex. F. An extraterritorial injunction against Lantah would also interfere with opposition

26   proceedings it has initiated against Telegram in the European Union. *See* Thompson Decl. ¶ 11

27   Exs. I-J. Thus, foreign jurisdictions have a vastly greater collective interest in this case than in

28   others where an extraterritorial injunction was denied. *See Star-Kist*, 769 F.2d at 1396 (deferring

1  to the law of the Philippines); *Ubiquiti*, 2012 WL 2343670, *8 (deferring to the law of

2  Argentina); *Pinkberry*, 2011 WL 6101828, *5 (deferring to the law of Japan); *Gallup*, 688 F.

3  Supp. 2d at 924 (deferring to the law of Pakistan).

4  Also, the effect of this dispute in the United States is relatively insignificant compared to

5  its effect abroad. In general, trademark infringement takes effect wherever consumers are likely

6  to be confused. *See Kaia Foods, Inc. v. Bellafiore*, 70 F. Supp. 3d 1178, 1184 (N.D. Cal. 2014).

7  In this case, consumers are likely to be confused *everywhere* if the parties concurrently use

8  "Gram" for cryptocurrency services on a globally distributed blockchain. Between one and six

9  percent of such consumers would be in the United States.[11]  By contrast, over ninety-four

10  percent of such consumers would be abroad – overwhelmingly in jurisdictions where Lantah

11  enjoys priority. *See* Thompson Decl. ¶¶ 3-8, Ex. F. Considering the relatively miniscule effect of

12  this dispute in the United States, the relatively significant effect this dispute abroad, and the

13  extremely widespread scope of Lantah's rights, it would be improper to issue the relief that

14  Telegram seeks. *See* Dkt. # 16-5.

15  As in *Star-Kist*, the remaining factors "do not mandate a contrary result." 769 F.2d at

16  1396. Although Lantah resides in the United States, Telegram does not. To the extent an

17  injunction broadly contradicts foreign law, it could not be expected to achieve compliance

18  abroad. Neither party intends to target the United States. Both parties intend to use a globally

19  distributed blockchain, with foreseeable effects around the world. *See* Dkt. # 1 ¶ 20; Jeffery

20  Decl. ¶ 2, Exs. A-C. No extraterritorial injunction should issue against Lantah on these facts.

21  "United States law governs domestically but does not rule the world." *Microsoft Corp. v.*

22  *AT &T.*, 550 U.S. 437, 454 (2007). "Comity, as the 'golden rule among nations,' compels us to

23  give the respect to the laws, policies and interests of others that we would have others give to

24  our own in the same or similar circumstances." *Mujica v. AirScan Inc.*, 771 F.3d 580, 608 (9th

25  Cir. 2014) (citation omitted). "[O]ften, the best way to further the basic goals of . . . an

26

27  [11]  United States residents comprise roughly five-percent of the global population and one-

28  percent of the initial target users for Telegram's prospective cryptocurrency services. *See* Thompson Decl. ¶¶ 8, 13 Exs. F, L.

American statute with foreign implications . . . is to take account of a foreign as well as the domestic legal landscape." Stephen Breyer, The Court and the World: American Law and New Global Realities at 7 (Knopf 2015) (Thompson Decl. Ex. M). Such is true here.

## CONCLUSION

Accordingly, no injunction should issue against Lantah, Telegram's claims should be denied as a matter of law.

Respectfully submitted,

THOMPSON & CO.

Dated: July 12, 2018

*/Donald A. Thompson/*
Donald A. Thompson
Counsel for Defendant and Counterclaimant,
LANTAH LLC.