JOHN NEUKOM (SBN 275887)
john.neukom@skadden.com
PATRICK HAMMON (SBN 255047)
patrick.hammon@skadden.com
JAMES Y. PAK (SBN 304563)
james.pak@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone:   (650) 470-4500
Facsimile:    (650) 470-4570

Attorneys for Plaintiff
TELEGRAM MESSENGER INC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| TELEGRAM MESSENGER INC,<br><br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>LANTAH LLC,<br><br>　　　　　　　　Defendant. | CASE NO.: 3:18-cv-2811<br><br>**PLAINTIFF TELEGRAM MESSENGER INC'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　　　　August 3, 2018<br>Time:　　　　10:00 a.m.<br>Courtroom:　6, 17th Floor<br>Judge:　　　Hon. Charles R. Breyer |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

SUMMARY OF ARGUMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................ 2

    I.    Telegram Established Priority By Executing Purchase Agreements That Conferred A Subscription Right For A Certain Allocation of GRAMs ................. 2

        A.    Telegram's Purchase Agreements Show "Use In Commerce" Under A Faithful Reading Of The Case Law ........................................................... 2

        B.    The Purchase Agreement Itself Disproves Defendant's Argument Against Use In Commerce ................................................................................ 5

        C.    Services Were "Rendered" When Telegram Received Funds and Conferred Subscription Rights to Customers ................................................. 6

    II.    Telegram's Other Activities Provide A Separate Ground For Establishing Priority Under the "Totality of the Circumstances" Test ........................................ 7

    III.    Defendant Does Not Dispute That Its Simultaneous Use of the GRAM Mark Causes Irreparable Harm ................................................................................ 10

    IV.    Defendant Misconstrues The Extraterritorial Nature of Injunctive Relief Sought ............................................................................................................ 11

    V.    Telegram Will Respond to Defendant's Summary Judgment Motion in Due Course ............................................................................................................ 13

CONCLUSION ...................................................................................................................... 14

# TABLE OF AUTHORITIES

**CASES**

*American Express Co. v. Goetz*,
　515 F.3d 156 (2d Cir. 2008)..................................................................................................5

*Aycock Engineering, Inc. v. Airflite, Inc.*,
　560 F.3d 1350 (Fed. Cir. 2009)..........................................................................................5, 6

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
　174 F.3d 1036 (9th Cir. 1999) .............................................................................................5

*Cave Consulting Group, Inc. v. Optuminsight, Inc.*,
　No. C11-00469 EJD (HRL), 2014 WL 4467256 (N.D. Cal. Sept. 10, 2014).......................7

*Chance v. Pac-Tel Teletrac Inc.*,
　242 F.3d 1151 (9th Cir. 2001) ..........................................................................................8, 9

*Couture v. Playdom, Inc.*,
　778 F.3d 1379 (Fed. Cir. 2015)............................................................................................4

*Gallup, Inc. v. Business Research Bureau (Pvt.) Ltd.*,
　688 F. Supp. 2d 915 (N.D. Cal. 2010) ...............................................................................12

*Geo. Washington Mint, Inc. v. Washington Mint, Inc.*,
　349 F. Supp. 255 (S.D.N.Y. 1972) ...................................................................................4, 6

*Grupo Gigante SA De CV v. Dallo & Co.*,
　391 F.3d 1088 (9th Cir. 2004) ...........................................................................................11

*Halicki Films, LLC v. Sanderson Sales & Marketing*,
　547 F.3d 1213 (9th Cir. 2008) .............................................................................................7

*Halo Management, LLC v. Interland, Inc.*,
　308 F. Supp. 2d 1019 (N.D. Cal. 2003) ...........................................................................8, 9

*Kaneka Corp. v. Sinochem Jiangsu Co.*,
　No. CV 09-7290 GHK (SSx), 2012 WL 13001420 (C.D. Cal. Apr. 24, 2012).....................6

*Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*,
　998 F. Supp. 2d 890 (C.D. Cal. 2014) .................................................................................8

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
　571 F.3d 873 (9th Cir. 2009) .............................................................................................10

*New West Corp. v. NYM Co. of California, Inc.*,
　595 F.2d 1194 (9th Cir. 1979) ..........................................................................................3, 6

*Pinkberry, Inc. v. JEC International Corp.*,
　No. CV 11-6540 PSG (PJWx), 2011 WL 6101828 (C.D. Cal. Dec. 7, 2011).....................12

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
　261 F.3d 1188 (11th Cir. 2001) ...........................................................................................7

*In re Port Authority of N.Y. & N.J.*,
    No. 406,220, 1987 WL 124284 (T.T.A.B. Apr. 19, 1987) ................................................... 4

*Rolley, Inc. v. Younghusband*,
    204 F.2d 209 (9th Cir. 1953) ............................................................................................. 5

*Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*,
    769 F.2d 1393 (9th Cir. 1985) ......................................................................................... 11

*Terrell v. Contra Costa County*,
    232 F App'x. 626 (9th Cir. 2007) ..................................................................................... 5

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
    No. C, 12-2582CW, 2012 WL 2343670 (N.D. Cal. June 20, 2012) ................................ 12

**STATUTES**

U.C.C. § 2-106(1) (Am. Law Inst. 2012) ................................................................................... 6

N.D. Cal. Civil L.R. 7-3(c) ......................................................................................................... 5

**OTHER AUTHORITIES**

1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 2:2 (5th ed. 2017) ................................................................................................................................ 7

Black's Law Dictionary (7th ed.) ................................................................................................ 7

Black's Law Dictionary (10th ed.) .............................................................................................. 7

Carl Sandburg, Quotable Quote, Goodreads, https://www.goodreads.com/quotes/918291-if-the-facts-are-against-you-argue-the-law-if (last visited July 19, 2018) ................................ 2

N. Popper, App Coin Sale On Fast Track To $1 Billion The New York Times,
    March 5, 2018 ................................................................................................................. 10

N. Popper, Virtual Currency Offerings May Hit a New Peak with Telegram Coin Sale The New York Times, March 6, 2018 ................................................................................... 10

Vigna, Bitcoin Dive Fails to Halt 'ICO' Boom, The Wall Street Journal, February 23, 2018 ........ 10

With Apple, the Tech Reckoning Gains Momentum: DealBook Briefing,
    The New York Times, January 9, 2018 ........................................................................... 10

**SUMMARY OF ARGUMENT**

Based on the contents of Defendant's Opposition (Docket No. 20), it is now clear that Telegram's PI Motion (Docket No. 16) turns on the singular question of whether Telegram's conduct in January-March 2018 constituted "use in commerce" with respect to the GRAM mark for cryptocurrency. If the Court answers that question in the affirmative, the Court should order an injunction. That is because the bulk of Defendant's arguments against an injunction rely on the mistaken position that Telegram's past activities do not qualify as use in commerce, and thus (Defendant argues) Telegram does not have priority in the GRAM mark.[1] (*See* Opposition at 7-11 (arguing no priority in the mark because there has been no use in commerce); *id.* at 11-12 (arguing no harm because there has been no use in commerce of the mark, and thus there is no goodwill to be harmed); *id.* at 12 (arguing no hardship, for the same reason); *id.* (arguing that the public interest weighs against a preliminary injunction, for the same reason).)

Not only has Defendant's Opposition narrowed the scope of relevant questions for this Court to address in deciding Telegram's PI Motion, to a single question, the Opposition has also made the evidentiary inquiry necessary to answer that single question relatively straightforward. That is because Defendant, in opposing the PI Motion, has not even tried to argue that it used the GRAM mark in commerce before Telegram did. (*See generally id.* (making no attempt to argue that Defendant has ever used the mark in commerce, apparently even today).) Thus, this Court does not need to consider competing evidence about which party used the mark in commerce earlier than the other. The only question is whether Telegram has "used in commerce" the GRAM mark.

The evidence is clear that Telegram has been using the GRAM mark in commerce since at least January 2018. Starting in January 2018 and continuing through March 2018, Telegram has generated over $1.5 billion in sales using the GRAM mark. (Perekopsky Decl. ¶ 10.). Telegram

---

[1] The only issue that does not turn on this singular question is Defendant's "international comity" argument. But that issue relates primarily to the scope of injunctive relief to be ordered by this Court. Telegram addresses the argument (which is not supported by Defendant's own case law authorities) below. *See* Section IV, *infra*.

furthermore recorded that commercial activity publicly with the SEC. (Hammon Decl. ¶¶ 4, 9.) By contrast, Defendant's own SEC filing activity shows the opposite: a later in time submission that affirmatively states no revenues or sales. (*Id.*) The evidence also shows that Telegram was using the GRAM mark, in commerce, before Defendant apparently attempted to "squat" the mark by filing its ITU Application with the USPTO in late February 2018.

Faced with such evidence, Defendant in the Opposition apparently has heeded the first part of Mr. Sandburg's famous advice: "If the facts are against you, argue the law . . . ."[2] Specifically, Defendant argues that Telegram's execution of Purchase Agreements constitutes nothing but "private fundraising for prospective services" under the law, which Defendant argues would not qualify as "use in commerce," and cites numerous case law decisions directed to fundraising activities. (Opposition at 1, 8-9.) But Defendant is wrong on the law as it applies in this case. The Purchase Agreements were not "private fundraising for prospective services." They are executed, binding *purchase* agreements pursuant to which (i) Telegram has already collected over $1.5 billion and (ii) a collection of persons and firms (who paid those sums) own subscription rights. A fair reading of the case law (cited by both parties) points to the sensible conclusion that the execution of binding Purchase Agreements for more than $1.5 billion constitutes "use in commerce." As far as Telegram counsel can tell, a decision to the contrary would be unprecedented in U.S. trademark law.

## ARGUMENT

**I.     Telegram Established Priority By Executing Purchase Agreements That Conferred A Subscription Right For A Certain Allocation of GRAMs**

    **A.     Telegram's Purchase Agreements Show "Use In Commerce" Under A Faithful Reading Of The Case Law**

In an attempt to portray Telegram's sales activity as mere preparation for use of the GRAM mark in commerce, and not use itself, Defendant argues that Telegram's Purchase Agreements

---

[2] *See* Carl Sandburg, Quotable Quote, Goodreads, https://www.goodreads.com/quotes/918291-if-the-facts-are-against-you-argue-the-law-if (last visited July 19, 2018) ("If the facts are against you, argue the law. If the law is against you, argue the facts. If the law and the facts are against you, pound the table and yell like hell.").

show the receipt of "private investments" and not "actual sales." (Opposition at 8-11.) But this argument from Defendant appears to be wholly without evidentiary support. With its PI Motion, Telegram explained and provided supporting evidence to show that it had executed binding "Purchase Agreements" pursuant to which Telegram had sold GRAMs subscription rights to persons and firms (including dozens in the United States) and collected over $1.5 billion through such transactions. (*See* PI Motion at 2; Hammon Decl. at ¶¶ 3-4; Perekopsky Decl. at ¶ 10.) That evidence—unrebutted by Defendant—does not suggest an "investment." It instead shows purchases by third parties (and sales by Telegram) of over $1.5 billion using the GRAM mark. And that activity qualifies as "use in commerce" for purposes of trademark priority, given a fair reading of the case law.

To that end, two cases are squarely on point. In *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194 (9th Cir. 1979), the parties were in a priority dispute over the "New West" mark for a magazine. NYM sought to establish use in commerce (and thus priority in the mark) by demonstrating that it had both (i) solicited prospective customers through mailings; and (ii) received subscriptions from a number of those prospective customers. On those facts, the court determined that NYM had sufficiently demonstrated use in commerce and thus had priority in the mark. *Id.* at 1200. Indeed, in determining that the totality of NYM's actions established a right to the "New West" mark, the Ninth Circuit pointed specifically to the 430,000 individuals who had received subscription mailings, the countless other individuals who saw advertising, and the over 13,500 people who subscribed to NYM's magazine "prior to the printing of appellant's preview addition." *Id.* To be clear, the Ninth Circuit made no mention of whether the priority-mark-holder's magazines were actually delivered pursuant to the priority-establishing subscriptions, or whether the subscriptions were fully delivered upon. In other words, the subscriptions themselves (without considering whether the mark owner then made good on the subscriptions) formed the basis of the Court's decision that there had been "use in commerce."

The facts here are similar to *New West*. Telegram has already demonstrated that it had begun communicating about GRAMs with numerous sophisticated consumers in the cryptocurrency market by December 2017, and that Telegram's GRAM activities were being

3

reported widely in the press.  (Hammon Decl. ¶ 2.)  Moreover, Telegram has also demonstrated that it *executed* Purchase Agreements with such persons and firms beginning in January 2018.  (Perekopsky Decl. ¶ 10.) In the days and weeks that followed, Telegram executed Purchase Agreements for more than $1.5 billion.  (*See id.*)

In another case, *Geo. Washington Mint, Inc. v. Washington Mint, Inc.*, 349 F. Supp. 255 (S.D.N.Y. 1972), the parties were in a dispute over whether the plaintiff had established use in commerce for the similar marks, "The Geo. Washington Mint" and "The Washington Mint."  *Id.* at 257.  In order to demonstrate use in commerce, the plaintiff offered evidence that it had entered into contracts of sale with a substantial number of customers using the mark, even though it had not yet fulfilled those orders during the relevant time frame.  The court found that this was sufficient, stating that "this makes out a use by the plaintiff of its mark for the purpose of determining priority." *Id*. at 260.  Here, Telegram has already demonstrated that it had entered into contracts of sale (*i.e.*, the Purchase Agreements) beginning in January 2018.  (Perekopsky Decl. ¶ 10.)  But Telegram makes an even stronger case for use in commerce than the plaintiff in *Geo. Washington Mint* because the persons and firms that entered into the Purchase Agreements here paid an amount certain to Telegram and obtained in return a subscription right to a certain allocation of GRAMs.  The subscription right was conferred when the Purchase Agreement was executed and the payment made to Telegram.  Those facts present an even stronger case for finding use in commerce under the court's analysis in Geo. *Washington Mint*.

By contrast, Defendant does not cite a single case where executed sales agreements for a service to customers was insufficient to establish priority. (*See* Opposition at 7-11.)  Further, it is easy to distinguish Defendant's authorities for its position that acceptance of "pre-orders" of prospective goods and services is insufficient to establish use in commerce.  The party seeking trademark rights in those cases ***never entered into binding agreements for the sale of its goods or services***.  *See Couture v. Playdom, Inc.*, 778 F.3d 1379, 1381-82 (Fed. Cir. 2015) (finding that merely offering services was not sufficient to establish use in commerce where no one had accepted any such offer); *In re Port Auth. of N.Y. & N.J.*, No. 406,220, 1987 WL 124284 at *2-3 (T.T.A.B. Apr. 19, 1987) (analyzing the "use in commerce" standard for a trademark registration,

4

not for priority, and holding that use of the mark in mere "advertising, promotion and preparat[ion]" was not enough).

Similarly, the cases that Defendant identifies to support its argument that private development of goods and services does not constitute use in commerce are inapposite because ***they do not involve an actual sale of the trademarked goods or services***. *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1052-53 (9th Cir. 1999) (finding appellant's rights in the mark did not vest before it "actually sold" any goods or services under the mark); *Rolley, Inc. v. Younghusband*, 204 F.2d 209, 211-12 (9th Cir. 1953) (rejecting appellant's argument that it had priority where "[n]o evidence of a purchase of [Appellant's trademarked good] at a time prior to appellees' registration of the trademark was introduced"); *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1361 (Fed. Cir. 2009) (finding plaintiff did not establish priority where it had never offered its services to consumers, nor was any order for its services ever placed); *Am. Express Co. v. Goetz*, 515 F.3d 156, 160-61 (2d Cir. 2008) (finding that corporate consultant could not establish trademark use for a slogan that he proposed banks use to market their credit cards, where he had never sold a service in connection with the slogan).

### B. The Purchase Agreement Itself Disproves Defendant's Argument Against Use In Commerce

The case law authorities addressed above, and the "Purchase Agreement" evidence already submitted by Telegram with its opening PI Motion, should be sufficient to dispose of Defendant's misguided "investment" and "preparation" arguments. That said, Telegram recognizes that Defendant has attempted to misconstrue what a "purchase agreement" means in its Opposition. Given that Defendant has done so, Telegram on reply submits a representative copy of one of Telegram's priority-establishing Purchase Agreements.[3] (*See* Perekopsky Reply Decl. Ex. E.) The contents of that document support Telegram's position here, and contradict Defendant's "investment" theory. The Purchase Agreements here are entitled "Purchase Agreement For

---

[3] *See* N.D. Cal. Civil L.R. 7-3(c) ("Any reply to an opposition may include affidavits or declarations . . . ."); *Terrell v. Contra Costa County*, 232 F App'x. 626, 628-29 & n. 2 (9th Cir. 2007) (finding evidence submitted in reply was appropriate because it addressed the same set of facts supplied in the opposition, but "provide[d] the full context").

GRAMs" and feature the GRAM mark prominently. (*Id.* ¶ 3.) They are not agreements to invest in Telegram. (*Id.* Ex. E (p. 6 and Section 6.3(h).) Moreover, the Purchase Agreements are not mere solicitations or advertisements, but instead they are binding contracts that obligate purchasers to pay the purchase amount (as they have already done) in accordance with the provisions of the agreement. (*Id.* Ex. E (Section 2.2).) Those facts easily distinguish the mere advertising and promotional activity present in cases cited by Defendant. *See New West*, 595 F.2d at 1200 (noting that the magazine orders activity using the mark was "of such nature and extent as to create an association of the goods or services and the mark with the user thereof").

### C. Services Were "Rendered" When Telegram Received Funds and Conferred Subscription Rights to Customers

Defendant further argues that Telegram's substantial sales of subscription rights for GRAMs are insufficient to constitute use in commerce because Telegram's cryptocurrency has not yet issued, and without the availability of the cryptocurrency, no service has been "rendered." (Opposition at 7-8.) As stated above, persons and firms that entered into the Purchase Agreements paid an amount certain to Telegram and obtained in return a subscription right to a certain allocation of GRAMs. The services were rendered as soon as the Purchase Agreements were executed, the purchase price was paid, and the subscription right was conferred pursuant to the Purchase Agreement. That shows a "use in commerce" for purposes of trademark priority, regardless of whether or when the mark owner in fact fulfills the purchased (or subscribed-to) services. *See New West*, 595 F.2d at 1200 (subscription order activities for a magazine sufficient to establish use in commerce, without mention or consideration of whether any magazines had been delivered at the time); *Geo. Washington Mint*, 349 F. Supp. at 260 (purchase orders from customers sufficient to establish use in commerce even though no goods had yet been delivered).

In fact, as the court in *Aycock Engineering* (relied on by Defendant) recognized, the "use" requirement for services can be satisfied where there is "an open and notorious public offering of the services to those for whom the services are intended." *Aycock Eng'g*, 560 F.3d at 1358 (internal quotations omitted). This is also in accord with the generally accepted understanding of the terms "sale" and "rendering services." *See, e.g.*, *Kaneka Corp. v. Sinochem Jiangsu Co.*, No.

CV 09-7290 GHK (SSx), 2012 WL 13001420, at *5 (C.D. Cal. Apr. 24, 2012) ("[L]ooking to the ordinary meaning of the term 'sale[,]' [t]he definition . . . is: '1. The transfer of property or title for a price.  2. The Agreement by which such transfer takes place.  The four elements are (1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised.'") (alterations and ellipsis in original) (quoting *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir. 2005) (quoting *Black's Law Dictionary* 1337 (7th ed. 1999))); *see also Black's Law Dictionary* 1537 (10th ed.) ("2. The agreement by which such a transfer takes place.").

Moreover, as Defendant well knows, businesses often sell cryptocurrency subscription rights to consumers in the cryptocurrency market as the coins are being developed.  If such activity could not meet the criteria of services "rendered," then a company could spend months or years making sales and developing its brand and network without any protection from others that seek to use the same mark.  That situation would inevitably lead to confusion and deception regarding which cryptocurrency service was being purchased, as well as irreparable harm to the business that is unable to control the reputation of its mark.  Fortunately, trademark law prevents such a situation—its fundamental purpose is to protect consumers from confusion.  *See* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 2:2 (5th ed. 2017) ("Trademark law serves to protect consumers from deception and confusion over trademarks as well as to protect the plaintiff's infringed trademark as property").

## II. Telegram's Other Activities Provide A Separate Ground For Establishing Priority Under the "Totality of the Circumstances" Test

As the PI Motion demonstrated (PI Motion at 6), Telegram's business activities prior to February 25, 2018 further establish its priority in the GRAM mark under the "totality of circumstances" test.[4]  As Defendant correctly emphasizes, the Ninth Circuit recognizes priority for

---

[4] *See Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193-96 (11th Cir. 2001); *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1226 (9th Cir. 2008).  To be clear, Telegram has not "waived" its argument under this test.  And in any event, Defendant briefed the "totality of circumstances" test in its Opposition. (Opposition at 9.) *See Cave Consulting Grp., Inc. v. Optuminsight, Inc.*, No. C11-00469 EJD (HRL), 2014 WL 4467256, at *2 n. 2 (N.D. Cal. Sept. 10, 2014) (finding it proper to address arguments and introduce evidence in a reply based on arguments raised in an opposition).

non-sale or pre-sale activity. *See Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001) (holding that "the totality of the circumstances must be employed to determine whether a service mark has been adequately used in commerce so as to gain the protection of the Lanham Act."); *see also Halo Mgmt., LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1033-34 (N.D. Cal. 2003) (finding that plaintiff had sufficiently used its mark in commerce under the totality of the circumstances because it had placed the mark in the public domain and attached it to plaintiff's services in a readily accessible manner); *Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 998 F. Supp. 2d 890, 899-901 (C.D. Cal. 2014) (finding that plaintiff's pre-sales activity, including entry into agreements, was sufficient to support plaintiff's plausible claims of use in commerce).

The factors under this test are: (i) the genuineness and commercial character of the activity, (ii) the determination of whether the mark was sufficiently public to identify or distinguish the marketed service in an appropriate segment of the public mind as those of the holder of the mark, (iii) the scope of the non-sales activity relative to what would be a commercially reasonable activity of the holder to conduct the business using the mark, (iv) the degree of ongoing activity of the holder to conduct the business using the mark, and (v) the amount of business transacted. *See Chance*, 242 F.3d at 1159. All of those factors favor Telegram here.

*(i) The genuineness and commercial character of the activity.* The genuineness of Telegram's activity is clear given that Telegram had successfully executed numerous Purchase Agreements in the United States prior to the filing date of Defendant's ITU Application. (*See*, *e.g.*, Compl. at ¶¶ 31-32; Hammon Decl. ¶ 3; Perekopsky Decl. ¶ 10; Perekopsky Reply Decl. Ex. E.) Such activity was *bona fide* and engaged in good faith. Moreover, the commercial character of the activity is clear given the significance of Telegram's ongoing commercial activities. Telegram has generated over $1.5 billion in total sales using the GRAM mark. (Hammon Decl. ¶¶ 3-4.)

*(ii) The determination of whether the mark was sufficiently public.* By at least 2017, Telegram had been using the GRAM mark in connection with its development of a cryptocurrency and had been offering Purchase Agreements to certain prospective customers of the cryptocurrency consuming public. (*See* Hammon Decl. ¶ 2; Perekopsky Decl. ¶ 10.) Those activities using the GRAM mark were substantial enough that many financial and industry publications reported on

Telegram's activities in December 2017.  (Hammon Decl. ¶ 2.)  Therefore, Telegram's use of the GRAM mark was sufficiently public to identify or distinguish the marketed service for the cryptocurrency consuming public.

*(iii) Commercial reasonableness of the non-sales activity*.  The above described activities are certainly commercially reasonable and expected of a business owner using its mark.  In particular and as would be expected, Telegram made efforts to feature the GRAM mark in its Purchase Agreements relating to GRAMs.  (*See* Perekopsky Reply Decl. ¶ 3.)  And even before those Purchase Agreements were even executed, financial and industry publications reported on Telegram's efforts developing the GRAM cryptocurrency. (Hammon Decl. ¶ 2.)

*(iv) The degree of ongoing activity*.  Telegram's ongoing commercial activities are significant.  By February 13, 2018, Telegram had entered into $850 million in transactions related to GRAMs with 81 persons or firms.  (Hammon Decl. ¶ 3.)  By March 29, 2018, Telegram had entered into an additional $850 million in transactions related to GRAMs with 94 persons or firms. (Hammon Decl. ¶ 4.)  In total, Telegram has generated over $1.5 billion in total sales using the GRAM mark.  (Perekopsky Decl. ¶ 10.)

*(v) The amount of business transacted*.  As stated above, Telegram has generated over $1.5 billion in total sales using the GRAM mark.  (Hammon Decl. ¶¶ 3-4.)

Defendant puts great weight on the second factor—whether Telegram's mark was sufficiently public in the appropriate segment of the public mind—but says little to dispute Telegram's satisfaction of the remaining factors.  (Opposition at 10.)  Plus, Defendant's argument even as to the second factor is misplaced.  Defendant claims that Telegram did not use the GRAM mark in a public and notorious manner because the GRAMs were not marketed and offered to the general public.  (*Id.*)  But this misconstrues the law, which requires only that the ***appropriate segment*** of the consuming public be made aware of the mark.[5]  *See Halo Mgmt.*, 308 F. Supp. 2d at 1033.  The appropriate segment here are consumers in the cryptocurrency market.  And by at

---

[5]   Indeed, the Ninth Circuit repeated this point several times in *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1158-59 (9th Cir. 2001), a case cited repeatedly by Defendant.  (*See* Opposition at 2, 7-11.)

least 2017, Telegram had been using the GRAM mark in connection with its development of a cryptocurrency and had been communicating about Purchase Agreements with numerous sophisticated consumers in the cryptocurrency market. (*See* Hammon Decl. ¶ 2; Perekopsky Decl. ¶ 10.) This activity was successful and public enough such that the technology and mainstream press was writing articles about Telegram's GRAM marketing and sales activities.[6] And of course in the subsequent months, over 150 persons or firms from the cryptocurrency market executed Purchase Agreements for more than $1.5 billion. (*See* Hammon Decl. ¶¶ 3-4.)

For these reasons, Telegram's non-sales activity also establish Telegram's priority in the GRAM mark.

### III. Defendant Does Not Dispute That Its Simultaneous Use of the GRAM Mark Causes Irreparable Harm

Defendant does not dispute that its use of the GRAM mark causes irreparable harm, which further warrants the entry of a preliminary injunction here. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). As noted in the PI Motion, Defendant already conceded that irreparable harm is caused by both parties using the same mark. (Answer at 38-39). And in its Opposition, Defendant debates irreparable harm only by re-asserting its overarching (and incorrect) position that Telegram has not used the GRAM mark in commerce, thus has no priority, thus has no trademark rights to be harmed. (Opposition at 12.) As discussed above, that argument is incorrect.

Defendant also argues that Telegram can use a different mark for its cryptocurrency, but ignores the plain fact that so too can Defendant. (Opposition at 12.) In fact, given that Telegram has generated over $1.5 billion in sales related to GRAMs (PI Motion at 2), and Defendant apparently has no revenue from its use of the mark, it would be far simpler, and cause far less harm, for Defendant to change its mark.

---

[6]   *See, e.g.*, *With Apple, the Tech Reckoning Gains Momentum: DealBook Briefing*, The New York Times, January 9, 2018, at 7; P. Vigna, *Bitcoin Dive Fails to Halt 'ICO' Boom*, *The Wall Street Journal*, February 23, 2018, at 1-2; N. Popper, *App Coin Sale On Fast Track To $1 Billion*, The New York Times, March 5, 2018, at 1-3; N. Popper, *Virtual Currency Offerings May Hit a New Peak with Telegram Coin Sale*, The New York Times, March 6, 2018, at 1.

## IV. Defendant Misconstrues The Extraterritorial Nature of Injunctive Relief Sought

Defendant improperly characterizes Telegram's motion for injunctive relief as a request for an "extraterritorial injunction." First and foremost, nothing in either Telegram's Complaint nor its PI Motion suggests that Telegram is seeking anything other than an injunction in the United States based solely on U.S. trademark law. Telegram has not requested, and is not seeking, any order from this Court directed to activity taking place outside of the United States.

Nevertheless, Defendant appears to argue that this Court should not enjoin activity within the United States merely because such an injunction *may* have "extraterritorial effect[s]." (Opposition at 12.) This is contrary to both common sense and law, and indeed, Defendant fails to cite a single case in support of its argument. Instead, Defendant relies on a series of cases that either directly contradict Defendant's contention or are easily distinguishable, given that they involved specific attempts to apply U.S. law to activities taking place outside the United States.

For example, Defendant relies heavily on *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393 (9th Cir. 1985). *Star-Kist* involved trademark infringement and false designation of origin claims brought in connection with activity happening both within the United States and wholly apart and separate from the United States. While the court refused to apply the Lanham Act to "wholly foreign commerce" happening entirely outside the United States—*e.g.*, commerce taking place entirely within the Philippines—it did find that it was appropriate for the court to address the U.S.-based activity, including activity that impacted foreign commerce. *See id.* at 1394-1396. Most notably, the Ninth Circuit affirmed the district court's injunction of the defendant from exporting goods bearing the trademark at issue from the United States to the Philippines. *Id.* Accordingly, in direct contrast to Defendant's assertion, the court in *Star-Kist* explicitly affirmed an injunction that had "extraterritorial effects," but refused to apply the Lanham Act to conduct happening entirely outside the United States. As noted above, Telegram is not seeking an injunction directed at foreign activity.

Defendant also cites *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088 (9th Cir. 2004) repeatedly as support for its argument. But, in that case, the Ninth Circuit determined that while the plaintiff was a foreign entity and had a valid, protectable interest in its "Gigante" mark in

1  Southern California, the doctrine of laches barred it from enjoining the use of the mark on
2  defendant's two grocery stores in the state. *Id.* at 1092-93. Thus, although the district court's
3  holding impacted the rights of a foreign company, and arguably had "extraterritorial effects," the
4  Ninth Circuit affirmed the application of United States law to locally-based activities.

5  For similar reasons, the remaining cases cited by Defendant provide no support for its
6  position. *See, e.g.*, *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, No. C 12-2582CW, 2012 WL
7  2343670, at *7-9 (N.D. Cal. June 20, 2012) (refusing to exercise extraterritorial jurisdiction over
8  trademark issued in Argentina, but agreeing to exercise such jurisdiction over U.S.-based
9  trademarks infringed internationally); *Pinkberry, Inc. v. JEC Int'l Corp.*, No. CV 11-6540 PSG
10 (PJWx), 2011 WL 6101828, at *1 (C.D. Cal. Dec. 7, 2011) (refusing to exercise jurisdiction over
11 claims directed exclusively to actions taking place in Japan); *Gallup, Inc. v. Bus. Research Bureau
12 (Pvt.) Ltd.*, 688 F. Supp. 2d 915, 925-26 (N.D. Cal. 2010) (finding that plaintiff had failed to
13 produce any evidence that defendant conducted any activities using the mark within the United
14 States).

15 Defendant has not identified a single case where a court refused to grant an injunction
16 within the United States, in connection with a U.S. trademark claim, merely because such an
17 injunction may have "extraterritorial effects." In fact, the majority of cases relied on by Defendant
18 stand for the opposite proposition, and demonstrate that courts are willing to apply the Lanham Act
19 in various contexts involving international actions, provided that there is a sufficient connection to
20 the United States. In this case, to put it mildly, there is a connection to the United States. Among
21 other facts, Defendant is incorporated in Florida, has headquarters in Florida, and has filed an ITU
22 Application for trademark purposes with the USPTO. (*See* Answer ¶¶ 12, 35.) Furthermore, in
23 this case, Defendant is soliciting potential purchasers of its cryptocurrency products and/or
24 services—using Telegram's mark—to contact Defendant at its Florida offices. (*See* Hammon Decl.
25 Ex G.)

26 Finally, Defendant argues that an injunction is inappropriate here as it would create a
27 "conflict" with foreign laws. That argument appears to be premised on the unsupported claim that
28 Defendant has priority in the GRAM mark in foreign jurisdictions, and, presumably, if Defendant

12

TELEGRAM'S REPLY IN SUPPORT OF PI MOTION                                    3:18-CV-2811

is enjoined from using the GRAM mark in the United States it will be unable to enjoy that priority internationally. However, this argument runs directly counter to the authority cited by Defendant holding that each country's trademark laws shall be limited territorially and shall not have extraterritorial application. (*See* Opposition at 13-14.) Indeed, as Defendant itself points out, under the Paris Convention, "[a] mark duly registered in a country… shall be regarded as independent of marks registered in the other countries… including the country of origin." (Paris Convention § 6(3).) Thus, the fact that Defendant may have registrations (valid or not) for GRAM in other countries would have no bearing whatsoever on whether it has rights to the same mark in the United States. Under Defendant's position, a party could obtain worldwide trademark rights simply by registering in one country; that is precisely the opposite of the Paris Convention's territoriality principle.

There is no support for Defendant's extraterritoriality argument. Telegram has not requested, and is not seeking, any order from this Court directed to activity taking place outside of the United States.

## V.   Telegram Will Respond to Defendant's Summary Judgment Motion in Due Course

In opposing Telegram's PI Motion, Defendant has also decided to use its one-and-only opportunity in this case to move for summary judgment. (*See* Standing Orders (Hon. Charles R. Breyer) ¶ 5 ("Each party is limited to filing one summary judgment motion.").) Telegram will respond to that motion in due course; its opposition brief is due July 26, 2018.

## CONCLUSION

For the foregoing reasons and the reasons set forth in its PI Motion, Telegram respectfully requests that the Court enter an order enjoining Defendant's further infringement of the GRAM mark.

DATED: July 19, 2018       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP


By:      /s/ John Neukom
         John Neukom

         Attorney for Plaintiff
         TELEGRAM MESSENGER INC

# CERTIFICATE OF SERVICE

STATE OF CALIFORNIA, COUNTY OF SANTA CLARA

I am employed in the county of Santa Clara, State of California. I am over the age of 18 and not a party to the action; my business address is 525 University Avenue, 14th Floor, Palo Alto, CA 94301. My email address is john.neukom@skadden.com.

On **July 19, 2018**, I served documents described as:

**PLAINTIFF TELEGRAM MESSENGER INC'S
REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

☒   (**BY CM/ECF NOTICE OF ELECTRONIC FILING**)  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **July 19, 2018,** at Palo Alto, California.

| John Neukom | /s/ John Neukom |
|---|---|
| Type or Print Name | Signature |