IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TELEGRAM MESSENGER INC,<br>Plaintiff,<br>v.<br>LANTAH, LLC,<br>Defendant. | Case No. 18-cv-02811-CRB<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiff Telegram Messenger and Defendant Lantah LLC are both developing cryptocurrencies, and they are both planning to call their cryptocurrency "GRAM." Telegram seeks an injunction barring Lantah from using "GRAM." See MPI (dkt. 16). Telegram asserts that it has a common law right to the GRAM mark because it used the mark in commerce earlier than Lantah did. Id. Lantah opposes the motion for preliminary injunction, arguing that Telegram might have planned to use the GRAM mark, but it didn't, and therefore Lantah's trademark application renders Lantah the rightful owner of the mark. See Opp'n (dkt. 20). Because the Court agrees with Telegram, it GRANTS the motion.

## I. BACKGROUND

### A. Telegram's Actions

Telegram Messenger is a large company, launched in 2013. Its messaging app focuses on speed and security and allows users to send messages, photos, videos and files via a variety of devices to groups of up to 100,000 people. See Perekopsky Decl. (dkt. 16-3) Ex. A ("Telegram FAQ") at 3. All chats are encrypted, and Telegram offers additional secret settings. Id. at 12. In early 2018, the Telegram Messenger app reached 200 million

monthly active users worldwide. Perekopsky Decl. ¶ 4. It delivers billions of messages every day. Id. ¶ 5.

According to Telegram, most blockchains in existence today have "limitations that have prevented their associated cryptocurrencies from gaining widespread use," the most significant of which is that they aren't fully scalable, slowing down as users and transactions increase. Id. ¶ 7. Telegram is developing a new distributed ledger platform, the Telegram Open Network or "TON" Blockchain, which seeks to improve upon the existing systems. Id. ¶¶ 6, 8. Telegram intends for the "native cryptocurrency" on the TON Blockchain to be the GRAM. Id. And it intends to launch in the fourth quarter of 2018. Id. ¶ 6.

Telegram adopted the name GRAM sometime in 2017. Id. at 9. In December 2017, a number of articles reported on Telegram's efforts to develop the TON Blockchain and GRAM cryptocurrency. See Hammon Decl. (dkt. 16-1) ¶ 2, Ex. A (articles from December 22, 2017 and December 27, 2017 reporting on development of TON Blockchain; "Cointelegraph learned that the currency of TON will be called 'Gram' and the platform will be natively integrated with many of the most popular messaging apps.").[1] Those articles continued into January 2018 and beyond. See, e.g., With Apple, the Tech Reckoning Gains Momentum: DealBook Briefing, The New York Times, January 9, 2018, at 7 (linking to Tech Crunch article, Josh Constine, Telegram plans multi-billion dollar ICO for chat cryptocurrency, https://techcrunch.com/2018/01/08/telegram-open-network, January 8, 2018).

Also in January 2018, Telegram began entering into purchase agreements with persons and firms, some within the United States, through which those persons and firms paid U.S. dollars or Euros in exchange for the right to receive an agreed upon number of

---

[1] Lantah's counterclaim acknowledges these articles, see Counterclaim (dkt. 14) at 8 ¶ 15 ("In December 2017, reports began to emerge that Telegram also intended to launch a cryptocurrency named 'Gram.' Telegram did not publicly confirm these reports."), but Lantah asserts in opposing this motion that it only did so "after being served with copies in this case," and that it had no "contemporaneous knowledge" of the articles. See Opp'n (dkt. 20) at 10 n.8.

2

1  GRAMs following the successful launch of the TON Blockchain. Perekopsky Decl. ¶ 10.
2  On February 13, 2018, Telegram made a public filing with the SEC, disclosing that it had
3  entered into purchase agreements totaling $850 million, with the first purchase agreement
4  executed in January 29, 2018. Hammon Decl. ¶ 3, Ex. B (stating that 81 persons or firms
5  were in an offering of $850 million). The filing, which did not mention GRAMs by name,
6  stated that the securities offered were "Purchase Agreements for Cryptocurrency."
7  Hammon Decl. Ex. B at 17. It further disclosed that "[t]he issuers intend to use the
8  proceeds for the development of the TON Blockchain, the development and maintenance
9  of Telegram Messenger and other purposes described in the offering materials." Id. at 18–
10 19. On March 29, 2018, Telegram made an additional filing with the SEC, disclosing a
11 second $850 million offering of purchase agreements. Hammon Decl. ¶ 4, Ex. C. That
12 form also did not mention GRAMs by name, stated that the securities offered were
13 "Purchase Agreements for Cryptocurrency," and referenced the TON Blockchain. Id.

Telegram has not filed a trademark application for GRAM in the United States. Apparently, it did, in April 2018, file an application to register GRAM in the European Union, which Lantah is opposing. Thompson Decl. (dkt. 20-2) ¶¶ 10, 11, Exs. G, H, I, J.

### B. Lantah's Actions

Lantah is a small company, started by 23-year old Daniel Jeffery in Florida last Summer. See Jeffrey Decl. (dkt. 20-1) ¶¶ 1-2. "Ever since, Lantah has been building a borderless marketplace based on a cryptocurrency called the 'Gram.'" Id. ¶ 2. On September 18, 2017, Lantah announced on its website its intention to have an ICO (initial coin offering) for the Gram. Id. Ex. A ("The Lantah ICO Explained") ("Our release date is still [sic] future and in order to prepare for that event, we're giving you some things to help you understand the gram and how it will be used."); see also id. Exs. B, C (October 6, 2017 website announcement re Grams; November 15, 2017 website announcement re Grams).[2]

---

[2] Despite having argued in opposing this motion that the date of its trademark application is what "matters," see Opp'n at 5, Lantah's counsel asserted at the motion hearing that Lantah's first use

3

On February 25, 2018, Lantah filed an "intent to use" trademark application with the USPTO covering the mark GRAM for "financial services, namely, providing a virtual currency for use by members of an on-line community via a global computer network." Hammon Decl. Ex. F (indicating that trademark was filed pursuant to 15 U.S.C. § 1051(b)). The USPTO has found the mark entitled to registration and was set to publish it as of July 24, 2018. See Jeffery Decl. Ex. E. Lantah subsequently filed numerous similar applications in foreign jurisdictions, including China, India, and South Korea. See Thompson Decl. ¶¶ 3–8, Exs. B, N–AD.

On March 9, 2018, Lantah initiated an ICO using the GRAM mark. Hammon Decl. ¶ 8, Ex. G ("The Lantah ICO PreSale (SAFT) Is Now Underway"). On the same day, Lantah submitted a filing with the SEC, representing that a final sale had yet to occur, that the total offering amount was $4,285,714, and that the total amount sold was $0. Hammon Decl. Ex. H at 54–55. Lantah also issued a press release relating to the Pre-ICO on March 14, 2018. See Counterclaim (dkt. 14) Ex. D ("Lantah Announces Pre-ICO Details for the First Blockchain-based Borderless Marketplace").

### C. This Suit

Telegram filed suit against Lantah on May 11, 2018, asserting claims for false designation of origin, common law trademark infringement, and statutory unfair competition. See Compl. (dkt. 1). Lantah has counterclaimed. See Counterclaim. Telegram has filed the pending motion for preliminary injunction, asking the Court to enjoin Lantah "from using the 'GRAM' mark, or any confusingly similar marks, in connection with a cryptocurrency or the provision of a cryptocurrency product or service." See MPI; Proposed Order (dkt. 16-5) at 2. Lantah opposes the motion, see Opp'n, and Telegram has filed a reply, see Reply (dkt. 22).

The Court notes that Lantah's opposition brief is actually a combined opposition

---

of the mark was far earlier, in "mid-2017." The Court has seen no evidence supporting that assertion, and does not consider the 2017 references on Lantah's website to be legally cognizable "use." See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1052–53 (9th Cir. 1999) (use of name on website with intent to use it commercially insufficient).

4

and "Counter-Motion for Summary Judgment." See generally Opp'n. On the eve of the hearing for this motion, Lantah sought to consolidate the hearing with a hearing on its motion for summary judgment. See Ex Parte Application (dkt. 31). The Court denied that request. See Order Denying Ex Parte Application (dkt. 32). Accordingly, this order addresses only the motion for preliminary injunction.

## II. LEGAL STANDARD

A preliminary injunction should issue where the plaintiff establishes that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." See Rodriguez v. Robbins, 715 F.3d 1127, 1133 (9th Cir. 2013). The Ninth Circuit evaluates these factors using a "sliding scale approach" such that "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

## III. DISCUSSION

Although the Court will consider all of the preliminary injunction factors, this dispute comes down to Telegram's likelihood of success on the merits, which in turn comes down to whether Telegram's actions leading up to Lantah's February 25, 2018, trademark application and its March 9, 2018, ICO constitute "use in commerce." The Court concludes that they do. Accordingly, Telegram has priority in the GRAM mark, and is likely to succeed on the merits. The other factors follow from there.

### A. Likelihood of Success on the Merits

The first question in evaluating a motion for preliminary injunction is whether the party is likely to succeed on the merits. See Rodriguez, 715 F.3d at 1133. To succeed on a false designation of origin claim under the Lanham Act, a plaintiff must demonstrate that the defendant "(1) use[d] in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or

5

misrepresents the characteristics of his or another person's goods." AECOM Energy & Constr., Inc. v. Ripley, No. 2:17-cv-05398, 2017 WL 4326373, at *3 (C.D. Cal. Sept. 28, 2017) (quoting Freecycle Network, Inc. v. Oey, 505 F.3d 898, 902 (9th Cir. Cir. 2007)). If Telegram can demonstrate that it is likely to succeed on its false designation claim under the Lanham Act, it has also demonstrated that it is likely to succeed on its common law and statutory unfair competition claims. See M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073, 1080 (9th Cir. 2005). As discussed below, Telegram is likely to succeed on the merits because it has demonstrated that it has priority in the mark, that Lantah used the mark in commerce after Telegram did, and that Lantah's use of the mark is likely to cause confusion.

### 1. Priority in the Mark

To establish that a party has priority in a particular mark over a rival user, it must show that it was the first to use the mark in commerce. One Indus., LLC v. Jim O'Neal Distrib., Inc., 578 F.3d 1154, 1158 (9th Cir. 2009) ("It is a cardinal principle of federal trademark law that the party who uses the mark first gets priority."). This is so even if the rival user has filed a trademark application: "[i]f another party can demonstrate that it used [a] mark before the holder filed its [intent-to-use trademark] application . . . then it may be entitled to an injunction." See WarnerVision Entm't Inc. v. Empire of Carolina, Inc., 101 F.3d 259, 262 (2d Cir. 1996); see also Grupo Gigante SA De CV v. Dallo & Co., 391 F.3d 1088, 1093 (9th Cir. 2004) ("It is 'not enough to have invented the mark first, or even to have registered it first.'") (quoting Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996)). The Lanham Act protects the earlier "use of a mark in commerce." Grupo Gigante, 391 F.3d at 1093; 15 U.S.C.A. § 1127 (defining "use in commerce" to mean "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark"). It does not protect the earliest conception of the mark. See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:11 ("An idea for a trademark is not a trademark.") (5th ed. 2018).

Lantah argues that Telegram does not have priority in the GRAM mark because it

6

has "rendered no services and used no mark." See Opp'n at 8. Put slightly differently, at the motion hearing, Lantah's counsel stated that the sale of services not yet rendered is not a use in commerce. Lantah characterizes Telegram's actions as "private fundraising for prospective services," and argues that "priority does not arise from mere 'intent' or 'preparation' to use a mark in connection with prospective goods or services, absent an application to register the mark." Id.

Lantah is correct that preliminary steps, taken to prepare to use a trademark, do not constitute use in commerce. McCarthy on Trademarks § 16:12 ("The traditional rule is that use of a symbol in steps preliminary to establishing a business does not establish a priority date or a use sufficient for federal registration."). For example, the Ninth Circuit held that using a mark in emails with lawyers and customers does not constitute use in commerce. See Brookfield Commc'ns, Inc, 174 F.3d at 1052. Nor does putting one's mark on an office door sign or letterhead, or on a prototype displayed to a potential buyer. Id. (discussing Steer Inn Sys., Inc. v. Laughner's Drive-In, Inc., 405 F.2d 1401, 1402 (C.C.P.A. 1969); Walt Disney Prods. v. Kusan, Inc., 204 U.S.P.Q. 284, 288 (C.D. Cal. 1979)). Indeed, Lantah cites to numerous cases in which courts have slapped down a party seeking to enforce a trademark because that party never actually sold its goods. See Opp'n at 8; see. e.g., Couture v. Playdom, Inc., 778 F.3d 1379, 1381–82 (Fed. Cir. 2015) (merely offering services, without rendering services, insufficient to establish use in commerce); Rolley, Inc. v. Younghusband, 204 F.2d 209, 211–12 (9th Cir. 1953) ("no evidence of a purchase [of appellant's product] . . . prior to appellees' registration"); Aycock Eng'g, Inc. v. Airflite, Inc., 560 F.3d 1350, 1361 (Fed. Cir. 2009) ("sporadic steps in preparing to offer . . . service to the public," including creating corporate entity, obtaining toll-free numbers, and contracting with taxi operators, did not constitute use in commerce where service itself never sold).

Telegram offers two responses to Lantah's preparation argument: first, that the purchase agreements demonstrate use in commerce, see MPI at 6–7, and second, that it has engaged in sufficient pre-sale activity to earn it priority in the mark, see Reply at 7–10.

7

The Court need not reach Telegram's second argument,[3] because it agrees with the first.

Telegram argues persuasively that it did more than prepare to use the mark, it used it to the tune of millions of dollars in sales. Indisputably, even before Lantah filed its trademark application on February 25, 2018, Telegram had entered into purchase agreements through which purchasers paid U.S. dollars or Euros in exchange for the right to receive a contractually agreed upon number of GRAMs following the successful launch of the TON Blockchain. Perekopsky Decl. ¶ 10. Those purchase agreements were titled "PURCHASE AGREEMENTS FOR GRAMS," and required purchasers to pay the required funds "in full immediately" in exchange for Telegram's promise to issue coin to the purchaser on the network launch date. See Perekopsky Reply Decl. (dkt. 22-1) Ex. E at 6, ¶¶ 2.1, 2.2, 13.1. On February 13, 2018, Telegram informed the SEC that that first batch of purchase agreements totaled $850 million. Hammon Decl. ¶ 3, Ex. B.

Even small sales can be sufficient to constitute a use in commerce. See Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1126 (9th Cir. 2006) ("While the first use need not be extensive, the use must be bona fide and commercial in character"); Allard Enterprises, Inc. v. Advanced Programming Res., Inc., 146 F.3d 350, 358 (6th Cir. 1998) ("As long as there is a genuine use of the mark in commerce, however, ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition."); see also Seal Shield, LLC v. Otter Prod., LLC, No. 13-CV-2736-CAB (NLS), 2014 WL 11350295, at *7 (S.D. Cal. Nov. 4, 2014), aff'd sub nom. Shield v. Otter Prod., LLC, 680 F. App'x 560 (9th Cir. 2017) ("To this court's knowledge, the Ninth Circuit has never found a person's bona fide sales of marked goods insufficient to establish proprietary rights in a mark, where the sales were not made merely to reserve a mark."); but see Gamerologist Group, LLC v.

---

[3] That argument relies on the totality of the circumstances test, and cases like Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1158 (9th Cir. 2001), which recognize that "advertising combined with other non-sales activity is sufficient to establish use in commerce." See Reply at 7–10. The Court is not aware of any evidence of Telegram's advertising in the record. Of course, there are articles in the record about Telegram's cryptocurrency efforts.

8

United States District Court
Northern District of California

1  Scientific Games Intern., Inc., 838 F. Supp. 2d. 141 (S.D.N.Y. 2011) aff'd 2013 WL
2  276078 (2d Cir. 2013) (sale for $30 each of four games bearing mark was "de minimis"
3  and insufficient to confer rights). These were not small sales.

4  Lantah insisted at the motion hearing that the purchase agreements are inadequate to
5  establish priority because they represent "private" purchases, and "the public has never
6  seen the mark." That language, from Brookfield, followed the Ninth Circuit's explanation
7  that "[t]he Lanham Act grants trademark protection only to marks that are used to identify
8  and to distinguish goods or services in commerce—which typically occurs when a mark is
9  used in conjunction with the actual sale of goods or services." See Brookfield Commc'ns,
10 Inc., 174 F.3d at 1051. The court in Brookfield was reiterating that "trademark rights can
11 vest even before any goods or services are actually sold" where the totality of the
12 circumstances so dictate, most often where there has been "widespread publicity of a
13 company's mark." Id. at 1052. Here, unlike in Brookfield, there are extensive sales of
14 goods/services, as well as numerous articles about Telegram's cryptocurrency. Even
15 assuming that the quoted language in Brookfield applies, it is simply inaccurate to say that
16 the public, particularly the appropriate segment of the public, see Chance, 242 F.3d at
17 1158, "has never seen" Telegram's use of the GRAM mark.

18 Lantah next argues that the sales are nonetheless irrelevant because "Telegram has
19 not provided any cryptocurrency services under "Gram." Opp'n at 7. Undeniably,
20 Telegram's GRAM has not yet issued. No matter. The purchase agreements are not mere
21 agreements to invest some time in the future. Executed, binding purchase agreements
22 "pursuant to which Telegram has already collected over $1.5 billion," and through which
23 purchasers own vested subscription rights in GRAMS, demonstrate a use in commerce.
24 See Reply at 2. Telegram certainly thought it had engaged in commerce when it recorded
25 those sales with the SEC, see Hammon Decl. ¶ 3, Ex. B, and the purchasers certainly
26 thought they had engaged in commerce when they sent Telegraph their money. Moreover,
27 the law supports the notion that the taking of orders, even without filling those orders, is a
28 use. See, e.g., Geo. Washington Mint, Inc. v. Washington Mint, Inc., 349 F. Supp. 255,

9

260 (S.D. N.Y. 1972) (holding that plaintiff's customers having ordered substantial numbers of plates, even though plaintiff had not yet filled those orders, "makes out a use by the plaintiff of its mark for the purpose of determining priority"); New West Corp. v. NYM Co. of Cal., Inc., 595 F.2d 1194, 1200 (9th Cir. 1979) (noting 13,500 subscribers to magazine without mentioning whether subscription holders' magazines were in fact delivered).

The Court therefore concludes that the purchase agreements show Telegram using the GRAM mark in commerce prior even to Lantah's trademark application, and establish Telegram's priority in the mark.[4]

### 2. Lantah's Use of the Mark

To prevail on a false designation claim, a plaintiff must demonstrate that the defendant used the infringing mark in commerce. See AECOM Energy & Constr., Inc., 2017 WL 4326373, at *3 (quoting Freecycle Network, Inc., 505 F.3d at 902). There is no dispute over this point, and the Court finds that Lantah used the GRAM mark in commerce when it conducted its Pre-ICO token sale and filed a Form D with the SEC. See Hammon Decl. Ex. G (March 9, 2018 website announcement: "The Lantah ICO PreSale (SAFT) is Now Underway"); id. Ex. H (March 9, 2018 Lantah SEC filing).

### 3. Likelihood of Confusion

A plaintiff must also demonstrate a likelihood of confusion in order to prevail on a false designation claim. See AECOM Energy & Constr., Inc., 2017 WL 4326373, at *3 (quoting Freecycle Network, Inc., 505 F.3d at 902). The parties agreed at the motion hearing that there is no dispute on this point, and Lantah previously agreed that there is a likelihood of confusion. See Counterclaim ¶ 38 ("Lantah admits that there is a likelihood

---

[4] The Court further finds that Telegram has made continuous use of the mark since then, though the parties do not seem to dispute this point. See Airs Aromatics, LLC v. Victoria's Secret Stores Brand Management, Inc., 744 F.3d 595, 599 (9th Cir. 2014) ("To establish a protectable ownership interest in a common law trademark, the owner must 'establish not only that he or she used the mark before the mark was registered, but also that such use has continued to the present.'"); see generally Perekopsky Decl. (discussing purchase agreements and continued development efforts).

10

of confusion between the cryptocurrency services that the parties respectively intend to render under 'Gram.'"); Hammon Decl. Ex. I (June 21, 2018 email from Lantah's counsel: "Lantah has already alleged and admitted likelihood of confusion."). Nonetheless, the Court includes a brief analysis of the issue.

The test for likelihood of confusion is whether "a reasonably prudent consumer" in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks. Palantir Techs. Inc. v. Palantir.net, Inc., No. 07-3863 CRB, 2008 WL 152339, at *2, *8 (N.D. Cal. Jan. 15, 2008). Courts analyzing likelihood of confusion look at eight factors: (1) the strength of the mark; (2) similarity of the marks; (3) proximity of the goods/services sold; (4) similarity in the marketing channels used; (5) the type of goods/services and the degree of care likely to be exercised by purchasers; (6) evidence of actual confusion; (7) defendant's intent in selecting its mark; and (8) likelihood of expansion into other markets. See AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348 (9th Cir. 1979).

The first Sleekcraft factor, strength of the mark, is determined with a two part test. The first part is conceptual strength. See McCarthy on Trademarks § 11:83. "GRAM" has conceptual strength because it is arbitrary—it makes no suggestion of what service it provides. The second part is commercial strength, or the marketplace recognition value of the mark. Id. Telegram has made little showing of GRAM's commercial strength. Under the second Sleekcraft factor, the two parties' marks are identical. This factor favors an injunction. The third and fourth Sleekcraft factors also favor an injunction: the two parties seek to use the exact same mark, GRAM, on the exact same product, cryptocurrency, in what will presumably be the same marketing channels. The fifth Sleekcraft factor, the type of goods, are exactly the same. The sixth Sleekcraft factor, evidence of actual confusion, weighs against an injunction, as there is no evidence that consumers of cryptocurrency are yet confused (or that many of them are aware of Lantah). The seventh Sleekcraft factor, the defendant's intent, is not significant, as there is no evidence that Lantah read the articles or was otherwise aware of Telegram's cryptocurrency in advance of Lantah's

11

development of its own cryptocurrency. The eighth and final Sleekcraft factor, likelihood of expansion into other markets, is also not very significant in this case, as the goods or services already compete. See Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 963 (2d Cir. 1996).

In sum, though not all of the factors favor an injunction, customers will quite likely be confused by two companies using the same mark on the same goods in the same marketing channels. This is enough to conclude that there is a likelihood of confusion. See Honor Plastic Indus. Co. v. Lollicup USA, Inc., 462 F. Supp. 2d 1122, 1132 (E.D. Cal. 2006) (citing Lindy Pen Co. v. Bic Pen Corp., 796 F.2d 254, 257 (9th Cir. 1986) (clear error to find no likelihood of confusion where "two products with virtually identical marks are in the same market"); Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 782 F.2d 1508, 1509 (9th Cir. 1986) (injunction appropriate where two marks, "Park 'N Fly" and "Park and Fly," were "virtually identical, and the services provided by the two parties are precisely the same").

Because Telegram has demonstrated that it has priority in the mark, that Lantah used the mark in commerce, and that Lantah's use of the mark is likely to confuse customers, Telegram is likely to succeed on the merits of its claims.

**B. Irreparable Harm**

The second question in evaluating a motion for preliminary injunction is whether the plaintiff faces irreparable harm. See Rodriguez, 715 F.3d at 1133. Courts cannot presume irreparable harm from a showing of likelihood of success on the merits of a trademark infringement claim. See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc., 736 F.3d 1239, 1248–49 (9th Cir. 2013). Nonetheless, here, there is no real dispute about irreparable harm. See Counterclaim ¶¶ 31, 36, 41 (alleging that Lantah faces irreparable harm if both parties are permitted to use the same mark); see also Future Domain Corp. v. Trantor Sys. Ltd., No. 93-812-THE, 1993 WL 270522, at *10 (N.D. Cal. May 3, 1993) (finding that plaintiff had essentially "conceded" that opponent faced irreparable harm by requesting its own restraining order). Lantah argues only that "Telegram warrants no

redress and suffers no harm because it enjoys no goodwill in 'Gram,'" citing to its likelihood of success arguments. See Opp'n at 11–12; see also Reply at 1 (noting that "the bulk of Defendant's arguments against an injunction rely on the mistaken position that Telegram's past activities do not qualify as use in commerce"). As the Court rejects Lantah's likelihood of success arguments, the Court also rejects this derivative argument.

Even if the Court were examining the irreparable harm question on a clean slate, however, there is ample evidence of irreparable harm. See Paul Frank Indus., Inc. v. Sunich, 502 F. Supp. 2d 1094, 1102 (C.D. Cal. 2007) ("Infringing activity may lead to a loss of control over [plaintiff's] reputation and/or dilution of the goodwill that [plaintiff] has built up over the years. Such damage is difficult, if not impossible to measure or undo"). Irreparable harm is demonstrated where infringement will "cause Plaintiff to lose its ability to control its brand reputation and goodwill, since what could be perceived by consumers as the quality of Plaintiff's product risks no longer being within Plaintiff's control." Brooklyn Brewery Corp. v. Black Ops Brewing, Inc., 156 F. Supp 3d 1173, 1185 (E.D. Cal. 2016). Telegram has built up a reputation for cryptography and distributed computing, which it is trying to leverage in developing its cryptocurrency. See Perekopsky Decl. ¶¶ 2, 8, Ex. A. It has built some brand recognition in connection with the TON Blockchain and the GRAM mark, through its signing of $1.5 billion in purchase agreements, and the media coverage it has received. See Hammon Decl. ¶¶ 2–4. Lantah's use of GRAM for a competing cryptocurrency would harm the goodwill Telegram has in its mark, cause confusion about the source of the cryptocurrencies being developed, and, if Lantah's products are inferior, reflect adversely on Telegram's reputation. See Feldenkrais Guild of N. Am. V. Wildman, No. 18-cv-2340-YGR, 2018 WL 2331905, at *5 (N.D. Cal. May 23, 2018) (granting injunction where defendant's use of mark "likely to result in . . . loss of the value associated with the [plaintiff's] Marks and [other] reputational harm, as well as loss of goodwill"). Telegram also faces the loss of prospective customers if Lantah is able to siphon off prospective Telegram customers. See Stohlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 841 (9th Cir. 2001) ("evidence of threatened loss of

prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm").

Telegram has demonstrated that it risks irreparable harm.

### C. Balance of Equities

The third question in evaluating a motion for preliminary injunction is whether the balance of the equities tips in the plaintiff's favor. See Rodriguez, 715 F.3d at 1133. Lantah argues that the balance of the equities disfavors Telegram, because Telegram is the junior user and can promptly change to another mark. Opp'n at 12 ("'Gram' is taken."). Because the Court rejects Lantah's argument as to priority of the mark, the Court also rejects this derivative argument. See Reply at 1 (noting that "the bulk of Defendant's arguments against an injunction rely on the mistaken position that Telegram's past activities do not qualify as use in commerce"). Telegram asserted in its motion that "Unlike Telegram's extensive activity relating to its TON Blockchain and GRAM cryptocurrency and Purchase Agreements thus far, there is no evidence that Defendant has invested anywhere near the same amounts of time, energy, or resources in cultivating equity in the GRAM mark." MPI at 13; see also Perekopsky Decl. ¶ 9 (since 2017, Telegram "has . . . been using that mark in connection with its development of a cryptocurrency for use on the TON Blockchain, including providing purchase agreements in respect to of this cryptocurrency, and its development of software to provide access to financial products and services for customers on the TON Blockchain."). Lantah did not respond to this point in its opposition brief, or point to evidence of its own efforts. And there is no evidence that Lantah has made any sales in connection with its cryptocurrency, compared to the $1.5 billion in sales that Telegram has done. See Hammon Decl. Ex. H (Lantah SEC filing). It would be easier for Lantah to change its mark. See Philippe Charriol Int'l, Ltd. v. A'lor Int'l, Ltd., No. 13-cv-1257-MMA-BGS, 2014 WL 12279502, at *6 (S.D. Cal. Apr. 10, 2014), rev'd on other grounds, 611 F. App'x 890 (9th Cir. 2015) (reversing course at early stage unlikely to cause infringing party permanent harm).

Telegram has demonstrated that the balance of equities tip in its favor.

14

### D. Public Interest

The final question in evaluating a motion for preliminary injunction is whether the public interest favors an injunction. See Rodriguez, 715 F.3d at 1133. Lantah argues that the public interest requires the Court to deny the injunction because there is no merit to Telegram's case. See Opp'n at 12 (quoting Skydive Arizona, Inc. v. Quattrocchi, 673 F.3d 1105, 1116 (9th Cir. 2012) ("Courts should not enjoin conduct that has not been found to violate any law.")). Because the Court concludes that Telegram has priority in the mark and that Lantah's use of the mark is likely to confuse the public, the Court concludes that the public interest favors an injunction. See Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc., 559 F.3d 985, 993 (9th Cir. 2009) ("avoiding confusion to consumers" is the "usual public interest in trademark cases").

Telegram has therefore demonstrated that the public interest, as well as all of the other relevant factors, favors an injunction.

### E. International Comity

Lantah maintains, however, that there is a further reason not to issue an injunction: "an extraterritorial injunction would cause a direct conflict with the law of every other sovereignty where [Lantah] has filed an application." Opp'n at 14. Lantah asserts that its numerous foreign applications "collectively encompass the vast majority of the global population: over 82%," id. at 6, and argues that no objection should issue unless "the interests of, and links to, the United States . . . are sufficiently strong, vis-à-vis those of other nations, to justify an assertion of extraterritorial authority," id. at 12 (quoting Timberland Lumber Co. v. Bank of America, N.T. & S.A., 549 F.2d 597, 613 (9th Cir. 1976), superseded by statute as stated in McGlinchy v. Shell Chem. Co., 845 F.2d 802 (9th Cir. 1988)).

This argument is easy to reject: "Telegram has not requested, and is not seeking, any order from this Court directed to activity taking place outside of the United States." Reply at 11. Moreover, to the extent that Lantah's argument could be stretched to mean that this Court should not issue even an injunction that is limited to the United States

15

because such an injunction might have an extraterritorial effect, that argument also fails. Lantah's reliance on Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393 (9th Cir. 1985) is misplaced. See Opp'n at 14. While the Ninth Circuit in Star-Kist Foods found that the district court had "acted in accordance with principles of international comity and fairness in excluding wholly foreign commerce from the Lanham Act case before it," 769 F.2d at 1396, the court also affirmed the district court's injunction as to products "sold within the United States or exported from the United States to either the Philippines or any other country," id. at 1394–95. The only injunction sought here pertains to Lantah's domestic use of the GRAM mark.

And certainly there can be no debate that this case has a domestic connection. Lantah is incorporated in Florida, has its headquarters in Florida, and has filed a trademark application with the USPTO. See Counterclaim ¶¶ 12, 35. Issuing an injunction limited to the United States is consistent with this Court's obligation to enforce domestic law, and with Lantah's own arguments about the purposes of the Paris Convention. See Opp'n at 13 (quoting McCarthy on Trademarks § 29:25 ("The [Paris] Convention is not premised upon the idea that the trademark laws of each member nation shall be given extraterritorial application, but on exactly the converse principle that each nation's law shall have only territorial application."); see also Grupo Gigante SA De CV, 391 F.3d at 1093 ("'priority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world'") (quoting McCarthy on Trademarks § 29:2).

The Court therefore rejects Lantah's argument about international comity.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Telegram's motion and will issue a separate injunction limited to Lantah's use of the GRAM mark in the United States. Bond

16

is set at $25,000.  <u>See</u> Fed. R. Civ. Proc. 65(c).

**IT IS SO ORDERED.**

Dated: August 8, 2018



CHARLES R. BREYER
United States District Judge